**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 09-1839**

VERIZON MARYLAND, INCORPORATED,

    Plaintiff - Appellee,

  v.

CORE COMMUNICATIONS, INCORPORATED,

    Defendant – Appellant,

  and

MARYLAND PUBLIC SERVICE COMMISSION; STEVEN B. LARSEN, In
His Official Capacity as Chairman of the Maryland Public
Service Commission; HAROLD D. WILLIAMS, In His Official
Capacity as Commissioner of the Maryland Public Service
Commission; ALLEN M. FREIFELD, In His Official Capacity as
Commissioner of the Maryland Public Service Commission;
SUSANNE BROGAN, In Her Official Capacity as Commissioner of
the Maryland Public Service Commission; LAWRENCE BRENNER,
In His Official Capacity as Commissioner of the Maryland
Public Service Commission,

    Defendants.

Appeal from the United States District Court for the District of
Maryland, at Baltimore.  J. Frederick Motz, District Judge.
(1:08-cv-00503-JFM)

Argued:  September 22, 2010  Decided:  December 16, 2010

Before WILKINSON, KING, and GREGORY, Circuit Judges.

Reversed and remanded by unpublished opinion. Judge Gregory wrote the opinion, in which Judge Wilkinson and Judge King joined.

---

**ARGUED:** Michael Brian Hazzard, ARENT FOX, LLP, Washington, D.C., for Appellant. Joseph Ruggiero, VERIZON COMMUNICATIONS INC., Arlington, Virginia, for Appellee. **ON BRIEF:** Joseph P. Bowser, ARENT FOX, LLP, Washington, D.C., for Appellant. Ann N. Sagerson, VERIZON, Arlington, Virginia; Scott H. Angstreich, KELLOGG, HUBER, HANSEN, TODD, EVANS & FIGEL, PLLC, Washington, D.C., for Appellee.

---

Unpublished opinions are not binding precedent in this circuit.

GREGORY, Circuit Judge:

The Telecommunications Act of 1996 (hereinafter "the Act") was designed to enable new Local Exchange Carriers (hereinafter "LECs") to enter local telephone markets with ease and to reduce monopoly control of these markets and increase competition among providers. Verizon Communications Inc v. FCC, 535 U.S. 467, 489 (2002); 47 U.S.C. §§ 251 et seq. Here, we must consider two questions that arise from interpreting the Act and the rules promulgated by the Federal Communications Commission (hereinafter "FCC") including (1) what type of connectivity an InterConnection Agreement (hereinafter "ICA") between an existing or Incumbent LEC (hereinafter "ILEC") and a new or Competitive LEC (hereinafter "CLEC") required and (2) whether the district court erred in finding that the loop connection requested by a CLEC was of a lesser quality than the InterOffice Facilities (hereinafter "IOF") interconnection proposed by an ILEC and therefore not in compliance with the ICA.

We find that the ILEC, Verizon Maryland, Inc. (hereinafter "Verizon"), violated the rules as promulgated by the FCC when it refused to provide the CLEC, Core Communications, Inc. (hereinafter "Core"), with the technically feasible, non-discriminatory interconnection that Core had requested. Therefore, we reverse the district court's grant of summary judgment and find that, as a matter of law, Verizon breached the

3

ICA.  The case is remanded to the district court for proceedings consistent with our ruling.

I.

This appeal arises from a decision by the district court overturning the Maryland Public Service Commission (hereinafter "the Commission").  The district court found that Verizon did not violate its duty under the Act or ICA when it declined to provide Core with the requested interconnection.

A. The Telecommunications Act of 1996

Under the provisions of the Act, all telecommunications carriers, both ILECs and CLECs, are obligated to interconnect their networks "directly or indirectly with the facilities and equipment of other telecommunications carriers."  47 U.S.C. § 251(a).  In other words, the Act creates a framework for the development of facilities-based competition in which ILECs are required to interconnect their networks with the networks of requesting CLECs.  This interconnection ensures that consumers of local telephone service may communicate with consumers who are served by a different LEC.  The Act also imposes a specific interconnection duty on ILECs.  ILECs must permit CLECs to interconnect directly to their network as long as they meet certain requirements.  47 U.S.C. § 251(c)(2).

4

B. The Interconnection Agreement

In 1999, Core was beginning to enter the local Baltimore telephone market. By statute, Core was entitled to connectivity with the existing incumbent network that was (1) "technically feasible"; (2) at least equal in quality to that provided by the ILEC to "itself or to any subsidiary, affiliate, or any other party to which the carrier provides interconnection;" and (3) "on rates, terms, and conditions that are just, reasonable, and nondiscriminatory." 47 U.S.C. § 251(c)(2)(B)-(D). In order to expedite negotiations, Core adopted an existing ICA between Verizon, the ILEC in the region, and American Communications Services, Inc.[1] pursuant to 47 U.S.C. § 252(i). The adoption of this agreement was approved by the Commission on September 15, 1999. The agreement stated that Verizon would provide interconnection "in accordance with the performance standards set forth in Section 47 U.S.C. § 251 (c) of the Act and the FCC regulations." J.A. 55.

Under 47 U.S.C. § 252(a)(1), ILECs and CLECs are free to negotiate binding ICAs "without regard to" the baseline interconnection performance standards set forth in the Act and

---

[1] American Communications Services, Inc. was another CLEC who was attempting to enter the telephone market in Baltimore. They had previously negotiated with Verizon to form the ICA which Core later adopted.

the corresponding FCC regulations. See 47 U.S.C. §§ 251(b)-(c); 47 C.F.R. §§ 51.305, 51.311, 51.313; Verizon Md., Inc. v. Global NAPS, Inc., 377 F.3d 355, 390 (4th Cir. 2004). In such circumstances, the generally applicable performance standards will only apply to the extent that the parties have not contracted around them.

All ICAs must be presented to the Commission for approval even when they have been negotiated by the parties. 47 U.S.C. § 252(e)(1)-(2). Commissions have also been vested with the authority to implement and enforce these agreements. Core Commc'n Inc. v. Verizon Pa., Inc., 493 F. 3d 333, 335 (3d Cir. 2007). According to the Commission, delays in interconnection are very costly to a new provider because it "cannot operate and earn revenue while it continues to incur expenses." J.A. 276-77. Delays can benefit the ILEC by reducing the chances that the CLEC is successful.

In the summer of 1999, Core initiated contact with Verizon regarding interconnection. On July 27, 1999, Core sent a letter to Verizon requesting an activation date of September 10, 1999. Core calculated this date based on section 4.4.4 of the ICA, which states that interconnection will not occur earlier than forty-five days after the receipt of a request for interconnection by Core. Also, as required by the ICA, Core provided Verizon with forecasts of Core's technical

6

requirements. The letter stated, "[p]lease confirm in writing if the requested interconnection activation date is acceptable, or, if it is not acceptable, please propose an alternate date, together with an explanation why such alternate date is appropriate." J.A. 132-33. Verizon did not respond in writing.

At a meeting on August 11, 1999, the parties agreed to use the "entrance facility" method of interconnection. J.A. 88. Entrance facilities are dedicated transmission facilities that connect ILEC and CLEC locations. Verizon describes four major steps for provisioning initial interconnection with Core using the entrance facility method: (1) constructing the physical interoffice facility between Verizon's and Core's networks; (2) provisioning transport circuits from Verizon's to Core's Wire Center; (3) provisioning transport circuit; and (4) establishing interconnection trunks between Verizon's switch and Core's switch.

Core requested interconnection with Verizon at its Wire Center on the tenth floor of the Court Square building in Baltimore, Maryland. That floor of the building was "on-net" with Verizon, meaning that it was physically connected to Verizon's central network through fiber feeder cables and an OC-12 multiplexer (hereinafter "OC-12 MUX"). Verizon had turned on an OC-12 Loop Ring at the building in June 1999, meaning that physical construction was complete, the optical signals were

7

transmitting, and the ring was service-ready. At some point, however, the OC-12 Mux was disconnected from the OC-12 Loop Ring.

Verizon claims that on August 11, 1999, it estimated that connection would take between four to six months. In an effort to speed things along, Core asked that Verizon expedite the interconnection process by using the existing OC-12 Loop Ring and OC-12 Mux for interconnection, as this would eliminate the need for Verizon to build new facilities. It also requested an interconnection activation date of September 18, 1999. Verizon agreed that using the existing OC-12 Loop Ring would be technically feasible, but would not commit to Core's proposal at the August 11 meeting until it first checked with other departments. The record indicates that the OC-12 Loop Ring had the capacity sufficient to support Core's initial request.

On August 15, 1999, Verizon informed Core that the OC-12 Mux had been "assigned" to some "customer of record," the identity of whom Verizon would not disclose. Thus, Verizon claimed that the OC-12 Mux was unavailable for interconnection. Later, Verizon admitted that Core was the customer of record for the OC-12 Mux. However, Verizon claims that Core was assigned to the OC-12 Mux in a retail capacity as a "customer" rather than as a "carrier."

8

On August 31, 1999, Verizon informed Core that, as a matter of policy, it would not use the OC-12 Loop Ring for interconnection, whether or not it was technically feasible. Verizon further explained on September 7, 1999, that it had previously classified the existing OC-12 Mux as a "customer" facility, rather than a "carrier" facility and that the OC-12 Mux would need to be "reinventoried" as a "carrier" facility in order to use it for interconnection. Instead of using the existing facilities, Verizon stated that it would need to physically detach the OC-12 Mux from the OC-12 Loop Ring, construct a new OC-12 ring interoffice facility ring ("New OC-12 IOF Ring"), and insert the multiplexer into the new ring before subsequent steps in the interconnection process could take place.

Core met with Verizon again on September 9, 1999, to express its desire to use the OC-12 Loop Ring for interconnection. As a result of the meeting, Verizon informed Core that it would complete construction of the New OC-12 IOF Ring and establish connection to the Wire Center by November 16, 1999. Core responded on September 24, 1999, that the November 16 date was not acceptable, and that Verizon had not yet articulated a reasonable justification for refusing to use the existing OC-12 Loop Ring for interconnection.

The new OC-12 IOF Ring was completed sometime between November 16, 1999 and November 30, 1999. Once the new OC-12 IOF Ring was "turned up," the parties were able to coordinate subsequent steps in the interconnection process by December 23, 1999, just over four months after the initial meeting between Core and Verizon.

C. The Maryland Public Service Commission

On October 9, 1999, Core filed a complaint with the Commission alleging that Verizon was unlawfully "refusing to provide interconnectedness" and demanding that Verizon connect immediately. Core amended its complaint on January 18, 2001, alleging that Verizon (1) breached the ICA "by failing to provide interconnection within the requested 45-day interval, and by refusing to negotiate an alternative interval," J.A. 296; (2) breached its agreement by not providing Core with the same terms it provides to others, J.A. 298[2]; (3) refused to provide interconnection "at a technically feasible point", J.A. 302; (4) "impos[ed] unjust and unreasonable terms and conditions on the interconnection process" J.A. 304; and (5) "breached its duty of good faith and fair dealing under the Interconnection Agreement

_____

[2] At oral argument, counsel for Core represented that loop connection is used in ten percent of these types of interconnections between Verizon and CLECs.

10

with Core by refusing to provide interconnection within a commercially reasonable time." J.A. 305. On March 25, 2002, count one was dismissed by the Commission and is not at issue in this matter.

On August 8, 2003, the hearing examiner, assigned by the Commission, entered a proposed order finding that Verizon had breached section 27.1 of the ICA and a duty of fair dealing and good faith under Maryland contract law. The hearing examiner made a factual finding that "Verizon did not provide interconnection to Core in as timely a fashion as it reasonably would have provided interconnection to any of its own customers." J.A. 116. Specifically, the Commission found that "it is undisputed that capacity was available and connection technically feasible" and that Verizon denied access to this connection in bad faith. J.A. 124.

On February 26, 2004, the Commission issued an order affirming the proposed order of the hearing examiner. On July 9, 2004, the Commission denied a motion by Verizon for reconsideration.

On February 25, 2008, Verizon filed a complaint in the District Court of Maryland seeking review of the Commission's finding. On March 30, 2009, the district court granted Verizon's motion for summary judgment thereby overturning the decisions of the Commission. The district court concluded that

11

Verizon had no duty to provide the lesser quality interconnection requested by Core since the ICA required Verizon to provide Core with a connection of equal quality to that which it provides "itself or to any subsidiary, affiliate, or any other party to which the carrier provides interconnection."

The district court found as a factual matter that the interconnection requested by Core was of lesser quality than the connectivity Verizon provided between carrier switching offices. Furthermore, the district court concluded that in order to determine Verizon's obligation pursuant to the ICA, one measures the quality of connection it provides between the carrier switching-offices, not between a carrier switching-office and an end-user. Thus, the district court held that Verizon would have been in violation of the ICA if it provided the interconnection requested by Core since it was not of equal quality to that provided between carrier switching-offices, which Verizon asserts would have effectively modified the ICA.[3] The district court also vacated the Commission's finding that Verizon breached its duty of good faith and fair dealing.

---

[3] It is worth noting that the record does not reflect that Verizon raised any concern about whether the loop connection quality would be in violation of the ICA until the litigation had commenced.

II.

We review de novo the district court's grant of summary judgment. See Garofolo v. Donald B. Heslep Assocs., Inc., 405 F.3d 194, 198 (4th Cir. 2005). Absent a statutory command, general standards for judicial review of agency action apply. A "state agency's interpretation of federal statutes is not entitled to the deference afforded a federal agency's interpretation of its own statutes. . ." GTE South, Inc. v. Morrison, 199 F.3d 733, 745 (4th Cir. Va. 1999) (citation omitted). Thus, we review de novo the Commission's interpretation of the Act. Nonetheless, "an order of a state commission may deserve a measure of respect in view of the commission's experience, expertise, and the role that Congress has given it in the Telecommunications Act." BellSouth Telecomms., Inc. v. Sanford, 494 F.3d 439, 447 (4th Cir. 2007).

Turning to the standard for our review of the Commission's fact-finding, we note first that the Act does not require us to sit as a "super" public utilities commission. Morrison at 745. Therefore, we review the fact finding of the state agency under the substantial evidence standard. Morrison at 745 (citation omitted). In applying the substantial evidence standard, a "court is not free to substitute its judgment for the agency . . . it must uphold a decision that has 'substantial support in the record as a whole' even if it might have decided differently

13

as an original matter." AT&T Wireless PCS, Inc. v. City Council of City of Virginia Beach, 155 F.3d 423, 430 (4th Cir. 1998). There is no meaningful difference between the "arbitrary and capricious" standard and substantial evidence standard with respect to fact finding. Morrison at 745 n.5.


                              III.

The Act of 1996 was designed to enable new telephone companies to enter into local markets with ease and to reduce monopoly control. Verizon Communications Inc v. FCC, 535 U.S. 467, 489 (2002); 47 U.S.C. §§ 251 et seq. The Supreme Court has provided the Circuit Courts with guidance about the purpose of the Act: "The 1996 Act both prohibits state and local regulation that impedes the provision of 'telecommunications service,' § 253(a), and obligates incumbent carriers to allow competitors to enter their local markets, 47 U.S.C. § 251(c)." Verizon at 492. Additionally, the Act is designed to "address[] the practical difficulties of fostering local competition." Id.

Core argues that the district court's order should be overturned for several reasons. First, Core asserts that the district court erred when it found that the Commission misconstrued federal law by requiring that Verizon provide interconnection over loop facilities. Instead Core argues that once a CLEC has requested a form of interconnection that is

                              14

available at any technically feasible point within the ILEC's network, then the ILEC must provide that form of interconnection on a non-discriminatory basis. Second, Core argues that the district court had no factual basis upon which to find that the requested interconnection was of lesser quality. Furthermore, Core maintains that if it requested a specific method of interconnection, then the court is in no position to dictate which kind of interconnection satisfies Core's needs. Lastly, Core contends that the court erred in finding that Verizon had not breached its duty of good faith and fair dealing.

Verizon argues that the Commission's opinion lacked foundation since it found that Verizon had an affirmative obligation to offer to amend the contract to authorize the manner of interconnection Core sought. In effect, this would require Verizon to alter its contract. Furthermore, Verizon argues that any amendment to the ICA must be in writing pursuant to provisions contained in the ICA. Therefore, Verizon reasons that it only had an obligation to provide the same method of interconnection it provides other CLECs and that the ICA could not be modified without written notice signed by all parties.

In order to make a determination about what type of interconnection Verizon had a duty to provide to Core, it is necessary to examine the contract between the parties: the ICA. The ICA provides that the ILEC will provide interconnection

in accordance with the performance standards set forth in Section 251(c) of the Act and the FCC Regulations, in particular the rules set forth in 47 Code of Federal regulations §§ 51.305(a)(3) to (a)(5), 51.311(A) to (c), and 51.313(b).

ICA, J.A. 57. The Act requires that interconnection of facilities and equipment be provided for "any requesting telecommunications carrier" so long as it meets three requirements. 47 U.S.C. § 251(c). It must be (1) "at any technically feasible point within the carrier's network," (2) at least equal in quality to that provided by the ILEC to itself or to any subsidiary, affiliate, or any other party to which the carrier provides interconnection, and (3) "on rates, terms, and conditions that are just, reasonable, and nondiscriminatory." 47 U.S.C. § 251(c). The first and third requirements are not in dispute. Thus, this Court's decision turns on interpreting what the Act meant when it prescribed interconnections between ILECs and CLECs "at least equal in quality" to the interconnection provided by an ILEC to "any subsidiary, affiliate, or any other party." 47 U.S.C. § 251(c).

The FCC rules, as adopted by the ICA, are instructive in determining whether interconnection through a loop facility satisfied the ICA. The rules promulgated by the FCC provide, in pertinent parts, that Verizon is required to provide interconnection at "a level of quality that is equal to that

16

which the ILEC provides itself, a subsidiary, an affiliate, or any other party." 47 C.F.R. § 51.305(a)(3). Furthermore,

> [t]his obligation is not limited to a consideration of service quality as perceived by end users, and includes, but is not limited to, service quality as <u>perceived by the requesting telecommunications carrier.</u>

<u>Id.</u> (emphasis added). These rules reflect a clear and unequivocal intention that the requesting telecommunications carrier is to play a significant role in determining the type and quality of interconnection it received from the ILEC. The Commission, which is responsible for overseeing the implementation of the Act throughout the state of Maryland, agrees with this interpretation.

Furthermore, Verizon had provided this kind of interconnection in the past. The Commission's finding is that Verizon has provided interconnection to other CLECs, and even Core, over high-capacity loop facilities just like the existing OC-12 Loop Ring and OC-12 Mux. The hearing examiner found that "despite having interconnected with Core over the common loop in other locations, in Baltimore Verizon resisted Core's requests on the grounds that the parties' ICA did not permit loop interconnection." J.A. 114. He went on to state that "Verizon's ability to interconnect with Core via the common loop outside Maryland, e.g., in New Jersey, Pennsylvania, West Virginia, Illinois and Massachusetts, is clear indication that

17

such connection should be possible in Maryland." Id. Thus, Core's request to interconnection through the OC-12 Loop Ring was not out of the ordinary.

Moreover, the record contains the declaration of Todd Lesser, President of North Country Communications, also a CLEC. Lesser states that Verizon agreed to provide interconnection to North Country Communications in Charleston, West Virginia over a shared retail ring in July 2001 until Verizon completed a dedicated ring. The retail ring is the equivalent to the OC-12 Loop Ring proposed by Core here. Even though this incident occurred after the initial dispute between Core and Verizon, it demonstrates that Verizon has provided other CLECs with interconnection through loop facilities, at least on a temporary basis. Clearly, Verizon could have provided interconnection with Core through the OC-12 Loop Ring.

If Verizon had negotiated a separate ICA with Core, it might find itself in a more favorable litigating position. Its problem, however, is that it did not do so. At no point does the ICA explicitly foreclose the use of loop interconnection or override the baseline performance standards governing ICAs. To the contrary, Section 27.1 of the ICA quite plainly states that Verizon "shall provide the Interconnection and unbundled Network Elements contemplated hereunder in accordance with the performance standards set forth in Section 251(c) of the Act and

18

the FCC Regulations."  Or, as the district court put it, "the ICA between Verizon and Core expressly incorporates the statute and regulations."  Verizon Md. Inc. v. Core Commc'ns, 631 F. Supp. 2d 690, 699-700 (D. Md. 2009).[4]

These performance standards, by design, favor Core, not Verizon.  See AT&T Corp. v. Iowa Utils. Bd., 525 U.S. 366, 371 (1999) ("The Telecommunications Act of 1996 . . . fundamentally restructures local telephone markets. . . . [I]ncumbent LECs are subject to a host of duties intended to facilitate market entry.").  For example, Verizon argues that the "equal in quality" requirement set forth in 47 U.S.C. § 251(c)(2) did not compel Verizon to use loop facilities when interconnecting with Core.  But the FCC's order implementing 47 U.S.C. § 251(c)(2) makes clear that the statute requires Verizon to provide loop interconnection if Core requests it:  "[T]o the extent a carrier

_____

[4] Verizon argues that Section 27.1 does not incorporate all of the performance standards set forth in the statute and regulations because it states that Verizon "shall be deemed to meet such performance standards" if it complies with certain time intervals for installation and repairs.  In Verizon's view, those time intervals are the only "performance standards" contemplated by the contract.  Verizon is incorrect.  However, the contract makes clear that the term "performance standards" refers to the requirements of § 251 and the corresponding regulations.  See Core Commc'ns, 631 F. Supp. 2d at 699-700. And while the parties determined that compliance with the time intervals would obviate the need to comply with the statute and regulations, they just as clearly agreed that the statute and regulations would apply in the absence of such compliance.

requests interconnection of superior <u>or lesser</u> quality than an incumbent LEC currently provides, the incumbent LEC is obligated to provide the requested interconnection arrangement if technically feasible." <u>In re Implementation of the Local Competition Provisions in the Telecommunications Act of 1996</u>, 11 FCC Rcd. 15,499, 15,615 (1996) (emphasis added). While Verizon did not need to contractually bind itself to the baseline interconnection performance standards, it elected to do so and must live with the results.

Therefore, we find that Verizon had a duty to provide Core with the requested interconnection and therefore breached its contract. The district court's grant of summary judgment is reversed and this matter is remanded for further proceedings consistent with this decision including a determination of damages.

Additionally, this Court notes that the district court's finding that the loop facility was lesser in quality to the other potential methods of interconnection (like IOF) was not based on evidence in the record. In its opinion, the district court notes that

> Core asserts that Verizon has not established that it provides a lesser quality of service to its retail customers . . . No factual findings were made before the Commission on this issue. I note that a letter was written by [the Commission] in another proceeding accepts Verizon's assertion that loop facilities are of lesser quality than IOF facilities.

20

J.A. 380 n. 5. We find that this is not sufficient evidence upon which to base a finding that the loop connection was of a lesser quality than the IOFs. The record reveals that this fact was disputed. Therefore we find that, construing all facts in favor of the non-moving party, the district court erred in finding that the loop connection was of lesser quality than the other connection proposed by Verizon.

Finally, since we find that Verizon breached its contract, we remand the question of whether Verizon also breached an implied duty of good faith and fair dealing to the district court for further consideration.

For the reasons explained above, we

REVERSE AND REMAND.