**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 12-2572**

_____

CORE COMMUNICATIONS, INC.,

        Plaintiff – Appellant,

    v.

VERIZON MARYLAND LLC, as successor entity to Verizon
Maryland, Inc.,

        Defendant – Appellee,

        and

MARYLAND PUBLIC SERVICE COMMISSION; STEVEN B. LARSEN, In
his official capacity as Chairman of the Maryland Public
Service Commission; HAROLD D. WILLIAMS, In his official
capacity as Commissioner of the Maryland Public Service
Commission; ALLEN M. FREIFELD, In his official capacity as
Commissioner of the Maryland Public Service Commission;
SUSANNE BROGAN, In her official capacity as Commissioner of
the Maryland Public Service Commission; LAWRENCE BRENNER,
In his official capacity as Commissioner of the Maryland
Public Service Commission,

        Defendants.

_____

Appeal from the United States District Court for the District of
Maryland, at Baltimore. J. Frederick Motz, Senior District
Judge. (1:02-cv-03180-JFM)

_____

Argued: December 12, 2013        Decided: March 6, 2014

_____

Before WILKINSON, KING, and GREGORY, Circuit Judges.

Affirmed by published opinion. Judge King wrote the opinion, in which Judge Wilkinson and Judge Gregory joined.

**ARGUED:** Ralph Lee Gleaton, II, GLEATON WYATT HEWITT, PA, Greenville, South Carolina, for Appellant. Scott H. Angstreich, KELLOGG, HUBER, HANSEN, TODD, EVANS & FIGEL, P.L.L.C., Washington, D.C., for Appellee. **ON BRIEF:** Andrew M. Hetherington, Jessica C. Collins, KELLOGG, HUBER, HANSEN, TODD, EVANS & FIGEL, P.L.L.C., Washington, D.C., for Appellee.

KING, Circuit Judge:

Plaintiff Core Communications, Inc. appeals the district court's award of summary judgment to defendant Verizon Maryland, LLC, successor to Verizon Maryland, Inc. (interchangeably "Verizon"), with respect to a pair of tort claims pursued by Core under Maryland law. See Core Commc'ns, Inc. v. Verizon Md., Inc., No. 1:02-cv-03180 (D. Md. Aug. 10, 2012), ECF No. 66 (the "Memorandum Opinion"). Core contends that the court further erred when, as a result of granting partial reconsideration of its Memorandum Opinion, it awarded nominal damages of only one dollar to Core on its related claim for breach of contract. See Core Commc'ns, Inc. v. Verizon Md., Inc., No. 1:02-cv-03180 (D. Md. Nov. 27, 2012), ECF No. 73 (the "Reconsideration Order"). As explained below, we affirm.

I.

A.

The Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56 (codified as amended in scattered sections of 47 U.S.C.) ("the Act"), was designed to increase competition in local telephone markets. See Verizon Commc'ns, Inc. v. FCC, 535 U.S. 467, 489 (2002). To that end, the Act required established telephone companies to enter into contracts known as interconnection agreements (in the singular, an "ICA") with new

market entrants seeking to connect with existing networks. See 47 U.S.C. § 251. In the Baltimore area, Verizon was the established phone company, that is, the incumbent local exchange carrier ("ILEC"), and Core was one of several new market entrants, known as competitive local exchange carriers (in the singular, a "CLEC"). Pursuant to the Act, Core sought an ICA with Verizon, and, in order to expedite negotiations, the two companies agreed — at Core's suggestion — to adopt the terms of a previously approved ICA between Verizon's predecessor and another CLEC. On July 14, 1999, the companies jointly submitted their proposed ICA to the Maryland Public Service Commission (the "PSC") for its review and approval. On September 15, 1999, the PSC approved that ICA (the "Core ICA").[1]

On July 27, 1999, while the PSC's approval of the Core ICA was pending, Core wrote Verizon to request that the proposed interconnection — as to which Core would be a wholesale customer of Verizon — be accomplished by September 10, 1999. At a

_____

[1] As the district court explained, "[r]ather than negotiate a new agreement with Verizon, Core decided to adopt the terms of Verizon's (then Bell Atlantic's) agreement with American Communications Services of Maryland, Inc." See Memorandum Op. 6. That agreement had been approved by the PSC about two years earlier, in 1997. Pursuant to regulations promulgated by the Federal Communications Commission under the Act, "an [ILEC] shall make available . . . to any [CLEC] any [ICA] in its entirety to which the [ILEC] is a party that is approved by a state commission." See 47 C.F.R § 51.809(a).

4

meeting between Core and Verizon on August 11, 1999, the companies agreed that Core's interconnection would occur at Verizon's "Wire Center" in Baltimore, which was "on-net" with Verizon, that is, the Wire Center was physically connected to Verizon's central network and housed the needed equipment. In tension with Core's proposed timeline, however, Verizon estimated that it would take another four to six months before the essential new equipment for Core's interconnection — including an OC-12 multiplexer (the "OC-12 Mux") and a corresponding OC-12 facility ring (the "OC-12 IOF Ring") — was available for use.

Desiring to avoid having its preferred date of interconnection delayed for several months, Core suggested that, instead of installing the new OC-12 Mux and OC-12 IOF Ring, Verizon should utilize an existing multiplexer and "Loop Ring" already in the Wire Center. Verizon acknowledged that it would be technically feasible to use the existing equipment for the Core interconnection, but, as a matter of internal policy, it declined to do so. On August 15, 1999, Verizon advised Core that, in any event, the existing multiplexer and Loop Ring were already assigned to a Verizon "customer of record."[2] Only later

_____

[2] On August 20, 1999, Core amended its initial notification to request that its interconnection with Verizon be deferred from September 10, 1999, until September 18, 1999.

did Verizon disclose that the customer of record to which it had referred was Core itself, already a Verizon retail customer in a separate context. The existing equipment was never used for the Core interconnection, and the new OC-12 Mux and OC-12 IOF Ring were installed by Verizon in late November 1999. The Core interconnection was consummated on December 23, 1999.

On October 8, 1999, Core filed a complaint with the PSC, alleging that Verizon had breached the Core ICA by delaying the interconnection. In 2004, the PSC ruled against Verizon, concluding that Verizon was obliged, under the Core ICA, to use its existing equipment and make the Core interconnection by September 18, 1999, as Core had requested. In 2008, Verizon sought review of the PSC's adverse order by filing a complaint for declaratory relief in the District of Maryland, as it was entitled to do under the Act.[3] Verizon's district court complaint ("Civil No. 08-503") requested a declaration that Verizon had neither violated the Core ICA nor any duty of good faith and fair dealing relating thereto. In June 2009, the court granted Verizon's request for summary judgment, thereby

---

[3] Pursuant to 47 U.S.C. § 252(e)(6), federal judicial review in the appropriate district court is the exclusive means of contesting a State commission's determinations relating to enforcement of an ICA. See Iowa Util. Bd. v. FCC, 120 F.3d 753, 803-04 (8th Cir. 1997), aff'd in part, rev'd in part on other grounds, 525 U.S. 366 (1999).

overturning the PSC's 2004 decision ruling Verizon in breach of the Core ICA. See Verizon Md., Inc. v. Core Commc'ns, Inc., 631 F. Supp. 2d 690 (D. Md. 2009). Core appealed the court's ruling, and we reversed. See Verizon Md., Inc. v. Core Commc'ns, Inc., 405 F. App'x 706 (4th Cir. 2010) (unpublished) (the "first appeal"). In so doing, we concluded that "Verizon had a duty to provide Core with the requested interconnection [in September 1999] and therefore breached [the Core ICA]." Id. at 714. We then remanded the matter to the district court for further proceedings, "including a determination of damages" and an assessment of "whether Verizon also breached an implied duty of good faith and fair dealing." Id.[4]

## B.

On October 13, 2011, the district court consolidated the remand proceedings in Civil No. 08-503 with a separate seven-count complaint that had been filed by Core against Verizon in the Circuit Court for Baltimore City nine years earlier, in 2002. Asserting federal question jurisdiction, Verizon had removed the state court complaint to the District of Maryland

---

[4] Because Core had never lodged a counterclaim in Verizon's declaratory judgment action, the district court might have been technically unable to comply with our instruction to calculate and award damages for Verizon's breach of the Core ICA. That latent pitfall, however, was obviated by the consolidation of the remand proceedings with Core's 2002 complaint, as described further herein.

7

("Civil No. 02-3180"), where, on January 8, 2003, it was administratively closed without prejudice to being reopened upon disposition of the PSC proceedings.

In its 2002 complaint, Core alleged a single count for breach of contract; three related claims for promissory estoppel, unjust enrichment, and breach of warranty; and three state law tort claims — misrepresentation (both negligent and intentional), concealment (both negligent and intentional), and unfair competition. Notably, the parties agreed in the consolidated proceedings — and also agree here — that our decision in the first appeal is entitled to preclusive effect on the issue of Verizon's liability for the breach of contract claim alleged in Core's 2002 complaint. The tort claims alleged in Civil No. 02-3180 derived from the proposition that Verizon had lied to Core about the reasons for delaying Core's interconnection in 1999, such delay constituting Verizon's breach of the Core ICA. In a similar vein, Core alleged that Verizon had improperly failed to disclose, in or about August 1999, Core's status as the Verizon "customer of record" assigned to the existing equipment at the Wire Center in Baltimore.

The district court's 2011 consolidation of the proceedings in Civil No. 08-503 and Civil No. 02-3180 engendered an early round of dispositive motions. After hearing argument, the court ruled, by order of February 2, 2012, that Core's promissory

8

estoppel, unjust enrichment, and breach of warranty claims had been rendered superfluous by the first appeal, inasmuch as Core could recover nothing on those claims that it was not already entitled to for Verizon's breach of the Core ICA. At the same time, Core conceded that there was no independent action under Maryland law for breach of a duty of good faith and fair dealing, effectively removing that claim from the litigation. Thus, as of early 2012, the following issues remained for resolution in the consolidated proceedings: (1) Core's damages for Verizon's breach of the Core ICA; and (2) Core's tort claims for misrepresentation, concealment, and unfair competition.[5]

On remand following the first appeal, the parties, in aid of the consolidated proceedings, engaged in further discovery. Of some importance was Verizon's deposition of Bret Mingo, Core's president. Mingo testified about, among other things, Core's initial entry into the telecommunications marketplace in Maryland in 1997. With respect to Verizon's refusal in August 1999 to use the existing multiplexer and Loop Ring at the Wire Center for Core's interconnection, Mingo clarified that Verizon

---

[5] In its August 10, 2012 Memorandum Opinion, the district court recognized Core's concession on the good faith and fair dealing claim. Therein, the court concluded that "dismissal of Verizon's claim for declaratory relief that it did not breach an implied duty of good faith and fair dealing is appropriate." Memorandum Op. 2 n.2.

had never maintained that such an interconnection was impossible. Instead, Verizon had asserted that the interconnection would violate its internal policies. Mingo also acknowledged that Verizon had never advised Core that Verizon intended to unduly delay the Core interconnection or deliberately contravene the Core ICA. Critically, Mingo acknowledged that he could not identify any untrue statement made in that regard by any Verizon employee.

Mingo also conceded that, at the time the Core interconnection negotiations were ongoing, he knew that Core was a retail customer of Verizon's at the Wire Center. Accordingly, upon visiting the Wire Center prior to the Core interconnection, Mingo became "perplexed" when Verizon advised him that the only multiplexer located there was already in use by an unnamed retail customer. J.A. 260.[6] Mingo did not share with Verizon, however, his contemporaneous belief that Core "must be [that] customer." Id. at 263. Finally, Mingo admitted that he knew that different Verizon employees were assigned to handle retail transactions — as opposed to wholesale transactions, such as that relating to the Core ICA — and he could not say whether any of those employees ever communicated with each other.

---

[6] Citations herein to "J.A. __" refer to the contents of the Joint Appendix filed by the parties in this appeal.

10

During the discovery proceedings, the parties exchanged expert reports on the damages issue. Core's expert opined that the interconnection delay of roughly three months had resulted in several million dollars of lost profits to Core from 1999 to 2011. Verizon's rebuttal expert, unsurprisingly, took a strong view to the contrary. The parties thereafter agreed to defer any expert depositions and Daubert motions pending completion of the summary judgment proceedings.

In early 2012, the parties submitted cross-motions for summary judgment regarding contract damages and the resolution of Core's surviving tort claims. Core reasoned that it was entitled to summary judgment on each of its tort claims for misrepresentation, concealment, and unfair competition, insisting that the facts necessary to prove each claim had been definitively established by our decision in the first appeal. In opposition to Core's motion for summary judgment and in support of its own cross-motion, Verizon emphasized the evidence that it had gleaned in discovery — particularly the deposition of Mingo — indicating that Verizon had neither intentionally breached the Core ICA nor deceived Core in any way.

In its summary judgment papers, Verizon argued for the first time that the Core ICA contained an exculpatory provision that served to insulate Verizon from the damages Core pursued.

Verizon directed the district court to section 26.2 of the Core ICA, which provides that

> [n]either Party shall be liable to the other in connection with the provision or use of services offered under this Agreement for indirect, incidental, consequential, reliance or special damages, including (without limitation) damages for lost profits (collectively, "Consequential Damages"), regardless of the form of action, whether in contract, warranty, strict liability, or tort, including, without limitation, negligence of any kind . . . . Notwithstanding the foregoing limitation, a Party's liability shall not be limited by this subsection in the event of its willful or intentional misconduct.

J.A. 531 (the "Exculpatory Clause" or the "Clause"). According to Verizon, the Exculpatory Clause barred the consequential, lost-profit damages that Core was demanding for Verizon's breach of the Core ICA. From that premise, Verizon reasoned, the only contract damages available to Core, consistent with the evidence it had forecast, were nominal in nature. Verizon contended, moreover, that the Clause barred recovery of damages for any tort claims, except those involving "willful or intentional misconduct," which, Verizon insisted, Core was unable to prove.[7]

---

[7] As explained further herein, at least three aspects of the Exculpatory Clause are pertinent here:

- That consequential damages cannot be recovered by either party;

- that negligence claims are barred; and

- that tort claims involving willful or intentional misconduct are preserved.

(Continued)

12

Core objected to Verizon's reliance on the Exculpatory Clause, asserting that Verizon had waived any rights thereunder by failing to timely invoke the Clause as an affirmative defense under Rule 8(c) of the Federal Rules of Civil Procedure, that is, by not properly pleading the Clause in its answer to Core's 2002 complaint. Core also pointed out that Verizon had not relied on the Clause at all in its declaratory judgment action.[8] If the Clause was not waived, Core argued, it was nevertheless unenforceable under Maryland law because it contravened the State's public policy. Finally, Core maintained, if the Clause were enforced, Core was yet entitled to recover damages based on Core's interpretation of the Clause, as well as the "performance penalties" authorized by section 27.3 of the Core ICA.

During the pendency of the summary judgment motions, Core withdrew its tort claim for misrepresentation, acknowledging that no evidence suggested that Verizon had made an affirmative misrepresentation of any kind. That concession left in dispute

---

[8] Relatedly, Core asserted that Verizon's invocation of the Exculpatory Clause was untimely because Verizon had not sought an interpretation of the Clause by the PSC. That contention is foreclosed by our recent decision in Central Telephone Co. of Virginia v. Sprint Communications Co. of Virginia, Inc., in which we ruled that the Act "does not require a State commission to interpret and enforce an ICA in the first instance." See 715 F.3d 501, 514 (4th Cir. 2013).

13

the following issues: whether the Exculpatory Clause had been timely invoked by Verizon; if so, its impact; Core's damages for Verizon's breach of the Core ICA; and whether Core's remaining tort claims — concealment and unfair competition — could be resolved on summary judgment, or should, on the other hand, be decided by a jury.[9]

On August 10, 2012, the district court filed its Memorandum Opinion resolving those issues. As a preliminary matter, the court rejected Core's assertion that Verizon had waived the benefit of the Exculpatory Clause by failing to properly and timely invoke the Clause in its pleadings. The court reasoned, "Unlike a statute of limitations affirmative defense . . . the [Exculpatory Clause was] an integral part of the contract at issue," and thus not subject to the pleading requirements of Rule 8(c). Memorandum Op. 15 n.6. Furthermore, the court explained that "no adverse consequences resulted from Verizon's failure to formally raise and discuss the [Exculpatory Clause]

_____

[9] Although Core's 2002 complaint alleged both "negligent" and "intentional" concealment, Maryland law recognizes a single cause of action for concealment, and intent to defraud or deceive is an essential element thereof. See Lloyd v. Gen. Motors Corp., 916 A.2d 257, 274 (Md. 2007). The Maryland courts have sometimes referred to the concealment action as "fraudulent concealment." See id. In any event, Core abandoned its claim for negligent concealment in the district court.

14

earlier since it was only after the Fourth Circuit's remand that [the district court] focused specifically on damages." Id.

With respect to the enforceability and impact of the Exculpatory Clause on the other issues, the district court conducted two separate analyses. As to the tort claims, the court ruled, on the basis of state law public policy principles, that the Clause could not be enforced.[10] With respect to the contract damages issue, the court opined that its enforcement of the Clause would frustrate the Act's goal of removing impediments to competition in local telecommunications markets. Thus, the Memorandum Opinion recited, the Clause could not bar Core's request for consequential damages on the breach of contract claim.

Turning to the merits of the concealment and unfair competition tort claims, the district court rejected at the outset Core's contention that the essential elements of those claims had been established by our decision's factual recitation in the first appeal. The court set forth that the crux of the concealment claim was that Verizon had obfuscated Core's status as the "customer of record" at the Wire Center in 1999, to which

---

[10] The district court's public policy analysis of the Exculpatory Clause, as applied to Core's intentional tort claims, was arguably unnecessary. Such claims, by the plain terms of the Clause, were outside its scope, and therefore preserved. See supra note 7.

15

the existing multiplexer and Loop Ring were already assigned. Had Core known that it was actually that customer of record, Core's argument went, it could have demanded an immediate interconnection using the existing Wire Center equipment. This theory, in the court's view, was fatally flawed. Focusing on the concealment claim's element of intent to defraud or deceive, see Lloyd v. Gen. Motors Corp., 916 A.2d 257, 274 (Md. 2007), the court could discern "no evidence supporting Core's contention that Verizon's motive in not disclosing the identity of the customer of record was to deceive Core, and thereby cause a delay in interconnection." Memorandum Op. 10.[11] The court then explained that Core's unfair competition claim failed for the same reasons, that is, there was a lack of proof on the issue of intent to defraud or deceive. See id. at 14. Accordingly, the court awarded summary judgment to Verizon on each of the remaining tort claims. A jury issue nonetheless remained, according to the court, with respect to the proper measure of damages for Verizon's breach of the Core ICA.

---

[11] As an alternative basis for awarding summary judgment to Verizon on the concealment claim, the district court explained that, even if Core could have established Verizon's intent to defraud or deceive, Core "[could not] prove that it took action in justifiable reliance on the concealment." Memorandum Op. 11. On this record, according to the court, "Core knew or should have realized that it was the unidentified customer of record." Id. at 12.

16

That jury trial, of course, never occurred. Core asked the district court to reconsider its rulings on the tort claims, highlighting evidence that it contended the court had not properly evaluated. Verizon filed its own reconsideration motion, maintaining that the court had erred by declining to enforce the Exculpatory Clause as a bar to consequential damages. Verizon therein directed the court's attention to decisions of the Federal Communications Commission (the "FCC") in which the FCC had consistently sanctioned similar exculpatory provisions in other ICAs. Those decisions, Verizon urged, were entitled to deference and application, in adherence to the Supreme Court's decision in National Cable & Telecommunications Ass'n v. Brand X Internet Services. See 545 U.S. 967, 980-81 (2005) (citing Chevron, U.S.A, Inc. v. Natural Res. Defense Council, Inc., 467 U.S. 837, 843-44 (1984) (explaining that agency's reasonable implementation of statute it administers is entitled to acceptance by federal courts)). Verizon also argued that the PSC's 1999 approval of the Core ICA was a conclusive determination that the Exculpatory Clause was consistent with the public interest.

The district court, by its Reconsideration Order of November 27, 2012, granted Verizon's motion and denied Core's. The Reconsideration Order therefore enforced the Exculpatory Clause as a bar to Core's recovery of any consequential damages

17

on its breach of contract claim. When it entered the Reconsideration Order, the court issued a separate memorandum to the parties, requesting them to "agree upon a form of judgment" that would be consistent with the "limited amount that the ICA permits in light of the rulings [the court] made," and which would "enable the parties to appeal [those] rulings." S.A. 3.[12] Verizon responded to the court's request a week later, on December 3, 2012, and proposed that the judgment award only nominal damages to Core. Verizon therein represented to the court that Core "[did] not object" to Verizon's proposed judgment. Id. at 4. Core did not independently or directly respond to the court's request or to Verizon's representation of Core's position, but instead filed a notice of appeal on December 26, 2012, prior to judgment being entered. Thereafter, on January 15, 2013, the court adopted Verizon's proposal for nominal damages and entered judgment accordingly, awarding Core the sum of one dollar. We possess jurisdiction pursuant to the provisions of 28 U.S.C. § 1291.[13]

---

[12] Our citation to "S.A. __" refers to the contents of the Supplemental Appendix filed by the parties in this appeal.

[13] In accordance with Rule 4(a)(2) of the Federal Rules of Appellate Procedure, Core's premature notice of appeal was effective upon the district court's entry of the judgment. Core, nonetheless, filed an amended post-judgment notice of appeal on January 17, 2013.

18

## II.

We review for abuse of discretion a district court's ruling that a defense was properly and timely raised.  See Polsby v. Chase, 970 F.2d 1360, 1364 (4th Cir. 1992), vacated and remanded on other grounds, 507 U.S. 1048 (1993).  We review de novo a district court's award of summary judgment, viewing the facts and inferences reasonably drawn therefrom in the light most favorable to the nonmoving party.  See Woollard v. Gallagher, 712 F.3d 865, 873 (4th Cir. 2013).  A summary judgment award is appropriate only when the record shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

## III.

On appeal, Core challenges three aspects of the district court's rulings.  First, it maintains that the court erred in allowing the Exculpatory Clause to be invoked, and then by enforcing the Clause as a bar to Core's recovery of consequential damages.  Second, Core contends that the court's summary judgment awards to Verizon on Core's concealment and unfair competition tort claims were erroneously made.  Finally, Core argues that, notwithstanding the Exculpatory Clause, the

court erred in ruling that Core was entitled to only nominal damages on its breach of contract claim.

A.

We will first assess the timeliness and application of the Exculpatory Clause. On this front, Core advances two arguments: first, that Verizon failed to timely invoke the Clause; and, second, that the Clause is void under principles of Maryland contract law.

1.

Core argues that Verizon waived the benefit of the Exculpatory Clause by neglecting to invoke it as an affirmative defense under Rule 8(c) of the Federal Rules of Civil Procedure, that is, by not properly pleading the Clause in its answer to Core's 2002 complaint. Lest Verizon's inattention be construed as a mere oversight, Core reminds us that Verizon continued to ignore the Clause in its declaratory judgment action. Thus, according to Core, the district court abused its discretion in permitting Verizon to raise the Clause, post-remand, in the summary judgment proceedings.

Put succinctly, we discern no abuse in the district court's ruling. In analyzing a party's failure to timely invoke an exculpatory provision, we have recognized an exception to Rule 8(c) where, as here, the pertinent provision was "evident" in the contract "before the trial court." Caterpillar Overseas,

20

S.A. v. Marine Transp. Inc., 900 F.2d 714, 725 n.7 (4th Cir. 1990). Although not relying specifically on Caterpillar Overseas to support its ruling on timeliness, the court nevertheless identified the salient legal principle. Furthermore, the court properly observed that Core was neither unfairly surprised nor unduly prejudiced by Verizon's delay in invoking the Exculpatory Clause, in that the parties did not have occasion to address the issue of damages until after the first appeal. Thus, the Clause was timely and appropriately invoked.

2.

Next, Core contends that the Exculpatory Clause cannot be enforced because Maryland law bars the use of "exculpatory agreements in transactions affecting the public interest." See Wolf v. Ford, 644 A.2d 522, 532 (Md. 1994). Verizon counters, however, that the Clause is enforceable under federal law, and that state law principles cannot, at this stage, void a provision of an ICA already approved by the appropriate State commission. Verizon maintains that, pursuant to the Act, the proper time for Core to object on the asserted basis of Maryland's public policy was prior to the PSC's approval of the Core ICA. We agree with Verizon.

The Telecommunications Act "t[ook] the regulation of local telecommunications competition away from the States," imposing a

21

federal regime to govern certain aspects of such competition. See AT&T Corp. v. Iowa Utils. Bd., 525 U.S. 366, 378 n.6 (1999). Approved ICAs between ILECs and CLECs are the "tools" through which the Act is implemented and enforced, and are thus, as we have explained, "creation[s] of federal law." See Verizon Md., Inc. v. Global NAPS, Inc., 377 F.3d 355, 364 (4th Cir. 2004) (internal quotation marks omitted). The contractual duty at issue in this case — Verizon's duty to interconnect with Core — is a duty imposed by the Act itself. Accordingly, the resolution of a claim regarding the scope of that statutory duty, including the remedies available for its breach, depends on the interpretation and application of federal law. See id.

None of our sister courts of appeals have weighed in on the specific issue of whether the Act abides the existence of an exculpatory provision in an approved ICA. Nonetheless, we are satisfied with the district court's conclusion that "exculpatory clauses, like section 26 of the [Core] ICA, are not void under the Telecommunications Act." See Reconsideration Order 1. The court so concluded by deferentially applying FCC decisions that have approved the use of exculpatory provisions under the Act. See In re Implementation of the Local Competition Provisions in the Telecomm's Act of 1996, 11 FCC Rcd. 15499, 15576 (1996) (hereinafter cited as the "Local Competition Order"); see also

22

<u>In re Cavalier Tel., LLC</u>, 18 FCC Rcd. 25887, 25985-87 (Wireline Comp. Bur. 2003) (hereinafter cited as the "<u>Cavalier Order</u>").

The Local Competition Order, in 1996, constituted the FCC's initial declaration implementing the local competition provisions of the Act.[14] Therein, the FCC "reject[ed]" the contention that it would be impermissible for an ILEC to request that a CLEC "limit its legal remedies as part of a negotiated [ICA]." <u>Local Competition Order</u> 15576. The FCC also recognized that exculpatory provisions are a legitimate negotiating tool; for example, "A party may voluntarily agree to limit its legal rights or remedies in order to obtain a valuable concession from another party." <u>Id.</u> The Local Competition Order identified only one circumstance where a request to limit a party's legal rights might be improper, and that circumstance is not applicable here. <u>See</u> <u>id.</u> (explaining that "an [ILEC] may not demand that the [CLEC] attest that the [ICA] complies with all provisions of [the Act], federal regulations, and state law").

In the 2003 Cavalier Order, the FCC arbitrated a dispute between an ILEC and a CLEC involving ICA negotiations in

---

[14] Certain of the regulations adopted in the Local Competition Order were subsequently vacated after review in the federal courts. <u>See</u> <u>Verizon Commc'ns, Inc. v. FCC</u>, 535 U.S. 467 (2002). All aspects of the Order upon which we rely today, however, remain undisturbed.

Virginia.[15] Those parties had already agreed to an ICA provision functionally identical to the Exculpatory Clause, which limited the ILEC's liability for lost profits and other consequential damages. The CLEC, however, sought to add a broad exclusion to the proposed ICA's exculpatory provision that would entitle the CLEC to damages "where [the ILEC] violat[ed] any law governing communications." See Cavalier Order 25985. The CLEC argued that its right to damages under the Act should not be curtailed or eliminated at the ILEC's insistence, because such a limitation would greatly diminish the ILEC's incentive to perform its obligations under the ICA. The ILEC countered that the broad exclusion effectively gutted the proposed ICA's exculpatory provision, and that the ICA otherwise provided the CLEC with sufficient protection.

The FCC agreed with the ILEC and rejected the CLEC's proposed change to the exculpatory provision. Specifically, the FCC determined that the CLEC's effort to "eviscerate" the exculpatory provision was "commercially unreasonable." See

---

[15] In the proceedings leading to the Cavalier Order, the FCC assumed jurisdiction when the State commission declined to resolve the Virginia dispute. See 47 U.S.C. § 252(e)(5) ("If a State commission fails to act to carry out its responsibility under this section in any proceeding or other matter under this section, then the [FCC] . . . shall assume the responsibility of the State commission . . . with respect to the proceeding or matter and act for the State commission.").

24

<u>Cavalier Order</u> 25986. The CLEC's concerns about undermining the ILEC's incentive to comply with the Act were mitigated, according to the FCC, by the remedies available elsewhere in the ICA and under applicable law. The FCC later issued an order approving an ICA between the parties that included the original exculpatory provision. See <u>In re Cavalier Tel., LLC</u>, 19 FCC Rcd. 4070 (Wireline Comp. Bur. 2004).

The Reconsideration Order's deference to these FCC decisions was entirely appropriate. In <u>Chevron</u>, the Supreme Court "established a familiar two-step procedure for evaluating whether an agency's interpretation of a statute is lawful." See <u>Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.</u>, 545 U.S. 967, 986 (2005) (citing <u>Chevron, U.S.A, Inc. v. Natural Res. Defense Council, Inc.</u>, 467 U.S. 837, 843–44 (1984)). First, we assess "whether the statute's plain terms directly address the precise question at issue." <u>Id.</u> (internal quotation marks and alterations omitted). If the statute is deemed ambiguous on the question, "we defer at step two to the agency's interpretation so long as the construction is a reasonable policy choice for the agency to make." <u>Id.</u> (internal quotation marks omitted). Applying that framework, we observe that the Act itself does not address the viability of an exculpatory provision in an ICA. The FCC's decisions, on the other hand, convincingly illustrate the agency's reasonable conclusion that

25

an exculpatory provision in an ICA does not offend any aspect of the Act. We are therefore obliged to acknowledge that Verizon's reliance on the Exculpatory Clause is not precluded by federal law.

Though federal law does not prohibit the use of an exculpatory provision in an ICA, the Act authorizes a State commission to reject any provision of an ICA that the commission deems "not consistent with the public interest, convenience, and necessity." See 47 U.S.C. § 252(e)(2)(A)(ii). This statutory prescription creates a narrowly defined time and forum for identifying and evaluating any state-level policy that might invalidate part or all of an ICA. Neither the Act nor any other provision of federal law, however, subjects a State commission-sanctioned ICA to any subsequent attack on the basis of a state law principle. By its approval, the PSC affixed the imprimatur of the State of Maryland on the Core ICA, confirming that it worked no injury to Maryland's public interest.[16] In that

---

[16] We are constrained to note that Core, like a man who buys a dog yet cannot abide fleas, seeks to avoid a key provision of the very agreement, that is, the Core ICA, that it previously insisted upon. Core's position in the district court and on appeal — that the Exculpatory Clause is inconsistent with Maryland's public interest — is a complete U-turn from the position Core took in 1999 when it sponsored the Core ICA before the PSC. Though we reject on the merits Core's newfound contentions regarding the enforceability of the Clause, we would not condone in any event Core's apparent effort to manipulate our court system. See King v. Herbert J. Thomas Mem'l Hosp., (Continued)

26

circumstance, no further consideration of Maryland law or policy is appropriate.[17] As our distinguished colleague Judge Michael aptly observed, "[o]nce the [ICA] is approved, the [Act] requires the parties to abide by its terms." See Verizon Md., 377 F.3d at 364. Accordingly, the district court did not err in enforcing the Exculpatory Clause in the consolidated proceedings.

B.

We next assess Core's challenge to the district court's summary judgment awards with respect to Core's state law tort claims for concealment and unfair competition. The Exculpatory Clause presents no obstacle to those intentional torts, inasmuch as the Clause does not limit the liability of either party for "willful or intentional misconduct." See J.A. 531.

---

159 F.3d 192, 196 (4th Cir. 1998) (recognizing application of judicial estoppel to party who "assert[s] a position that is factually incompatible with a position taken in a prior judicial or administrative proceeding," where tribunal has accepted initial position and party has assumed contrary position to gain unfair advantage) (citations omitted).

[17] It may well be that, in the absence of governing federal principles, a court should draw on appropriate state law contract principles for an interpretation of an ICA. See, e.g., Cent. Tel. Co. of Va. v. Sprint Commc'ns of Va., Inc., 715 F.3d 501, 517 (4th Cir. 2013). Such a limited use of state law principles, however, falls far short of Core's assertion that Maryland law "controls" our analysis of whether a party to an ICA may limit its liability thereunder.

27

Under Maryland law, the tort of concealment has five elements:

> (1) the defendant owed a duty to the plaintiff to disclose a material fact; (2) the defendant failed to disclose that fact; (3) the defendant intended to defraud or deceive the plaintiff; (4) the plaintiff took action in justifiable reliance on the concealment; and (5) the plaintiff suffered damages as a result of the defendant's concealment.

See Lloyd v. Gen. Motors Corp., 916 A.2d 257, 274 (Md. 2007). Each of those five elements must be proven by clear and convincing evidence. See Rhee v. Highland Dev. Corp., 958 A.2d 385, 389 (Md. Ct. Spec. App. 2008). The related tort of unfair competition, on the other hand, is a more "flexib[le]" cause of action, but in all instances requires proof of "fraud, deceit, trickery or unfair methods of any sort." See Delmarva Sash & Door Co. of Md., Inc. v. Anderson Windows, Inc., 218 F. Supp. 2d 729, 733 (D. Md. 2002) (citing Balt. Bedding Corp. v. Moses, 34 A.2d 338, 342 (Md. 1943)).

Core relies upon the same conduct to support both of its intentional tort claims: that Verizon failed to disclose that Core was the "customer of record" to which the then existing multiplexer and Loop Ring in the Wire Center had been committed, and that, had Core known that fact, it could have demanded an immediate interconnection. Verizon asserts that, viewed in the proper light, Core failed to produce any evidence of intent to

28

defraud or deceive, nor sufficient evidence of Core's reasonable reliance on Verizon's alleged deception.

As a preliminary matter, we reject, as did the district court, Core's assertion that the facts we "found" in the first appeal are sufficient to establish Verizon's liability for Core's tort claims. First, "it is axiomatic . . . that appellate courts do not make factual findings." See Robinson v. Wix Filtration Corp. LLC, 599 F.3d 403, 419 (4th Cir. 2010). Second, even if our factual recitation in the first appeal is accorded some weight, Core substantially overstates the inferences that could be permissibly drawn therefrom. Finally, Core's concealment and unfair competition claims were not litigated at all until the consolidated proceedings that occurred post-remand, and only then did the parties conduct discovery with an eye toward developing evidence specifically related to those intentional torts.

Based on our de novo review of the summary judgment record, we agree with the district court's assessment that no reasonable jury could find that Verizon unlawfully concealed any material fact from Core. Our conclusion in that regard turns on the element of intent to defraud or deceive. Core has simply offered no evidence suggesting that Verizon's failure to identify Core as the "customer of record" was driven by any intent to defraud or deceive Core. When given the chance,

29

Mingo, as Core's president, could merely assert that the failure to disclose occurred, and then theorize that Verizon must have done so intentionally in order to improperly delay the Core interconnection. A claim built on such rank speculation is insufficient to survive summary judgment, as the court properly recognized. Moreover, Mingo's concession that he knew, and did not share, that Core was a retail customer in the Baltimore Wire Center establishes that Core could not have reasonably relied on the intentional concealment it alleges.

Core's unfair competition tort claim fails for the same reason, that is, the lack of evidence on the element of intent to defraud or deceive. Though we are content to affirm the district court's rulings on the merits of Core's intentional tort claims, we also note our concern that those claims amount to little more than "the assertion of a contract claim in the guise of a tort." See Sibley v. Lutheran Hosp. of Md., Inc., 871 F.2d 479, 487 (4th Cir. 1989) (Murnaghan, J., concurring). Under Maryland law, "where the essence of a relationship between the parties is contractual in nature and the basis for the claim of defendant's dereliction is its failure to perform the contract, the cause of action . . . is not available in [tort], but only in an action for breach of contract." Abt Assoc., Inc. v. JHPIEGO Corp., 104 F. Supp. 2d 523, 527 (D. Md. 2000) (citing Baird v. C & P Tel. Co. of Balt., 117 A.2d 873, 879 (Md. 1955)).

Accordingly, the district court did not err in awarding Verizon summary judgment on Core's tort claims.

C.

Lastly, we review the propriety of the district court's judgment awarding nominal damages of one dollar to Core for Verizon's breach of the Core ICA. Core contends that, the Exculpatory Clause notwithstanding, it is yet entitled to more than nominal damages for three reasons: (1) Verizon's breach of the Core ICA involved "willful or intentional misconduct"; (2) the Core interconnection was not a "service" for purposes of the Clause; and (3) the Clause permits the award of "performance penalties," as provided for in section 27.3 of the Core ICA.[18]

Core's first theory, that it can recover consequential damages for Verizon's breach of the Core ICA because the breach involved "willful or intentional misconduct," is without merit. The "willful or intentional misconduct" exclusion to the Exculpatory Clause would apply exclusively to actions sounding

---

[18] Verizon contends that Core waived its arguments for damages notwithstanding the Exculpatory Clause by failing to object to Verizon's proposed form of judgment awarding nominal damages only. Verizon's point is that the district court specifically requested the parties' views on what damages were available in light of its ruling that the Clause was enforceable, and Core remained silent. Core, however, maintains that it misunderstood the court's request and believed it had no other recourse than to appeal. In these circumstances, we decline to deem Core's arguments waived and are content to address their merits.

in tort, because an intent to defraud or deceive is ordinarily not at issue in a breach of contract claim. In any event, Core is unable to show that Verizon engaged in any "willful or intentional misconduct."

Second, Core emphasizes that the Exculpatory Clause only limits Verizon's liability for consequential damages "in connection with the provision or use of services offered under [the Core ICA]." J.A. 531 (emphasis added). According to Core, interconnection is not a "service" within the meaning of the Clause. For this proposition, Core relies on a district court decision from New Jersey, deciding that interconnection is not a "'telecommunications service[]' for purposes of [the Act]." See Global NAPS, Inc. v. Bell Atlantic-N.J., Inc., 287 F. Supp. 2d 532, 547 (D.N.J. 2003). Verizon correctly responds that the court's ruling in Global NAPS has no bearing on the Clause. The phrase "Telecommunications Service" has a precise meaning under the Act, which the Core ICA expressly incorporates and employs in several instances. See J.A. 484 ("'Telecommunications Service' is as defined in the Act"); see also id. at 486, 496, 509, 512, 515, 524.[19] In the Clause, however, the parties do not

---

[19] The Act defines a "telecommunications service" as "the offering of telecommunications for a fee directly to the public, or to such classes of users as to be effectively available directly to the public, regardless of the facilities used." See 47 U.S.C. § 153(53).

32

use the term "Telecommunications Service," but instead use the single word "services." Thus, the parties intended to draw a distinction between a "Telecommunications Service" and mere "services." We conclude that, accorded its broad, ordinary meaning, the word "services" in the Clause must include the provision of an interconnection at Core's request.

Finally, Core maintains that it is entitled to "performance penalties" under section 27.3 of the Core ICA, which provides for a limited remedy not barred by the Exculpatory Clause. Verizon responds that section 27.3 imposes specific evidentiary requirements that Core has not met. Section 27.1 defines certain "performance standards" Verizon must satisfy in connection with its obligations under the Core ICA, and section 27.2 requires Verizon to submit quarterly reports of its network's performance with respect to those standards. See J.A. 531-32. If, "based on a statistically significant number of [such] reports" Core believes that Verizon is "not complying with the performance standards referenced in [section] 27.1," then section 27.3 permits Core to seek redress in a court of competent jurisdiction. Id.

Core has provided no evidence to satisfy the predicate conditions for the performance penalties provided for in section 27.3. Core does not point to any quarterly report, much less a "statistically significant number" thereof. Instead, it relies

33

on only one arguable instance of non-compliance, which is insufficient to trigger the performance penalties provision of section 27.3. Moreover, even if we were to ignore the quarterly report requirement, we are not swayed by Core's unsupported assertion that it could prove thousands of unspecified performance failures by Verizon. Core had the opportunity to marshal such evidence in the summary judgment proceedings, and it failed to do so. Accordingly, Core is not entitled to performance penalties under section 27.3.

The Exculpatory Clause therefore bars any liability for consequential damages arising from Verizon's breach of the Core ICA, and Core has failed to establish its entitlement to any other remedy. As a result, the district court properly entered judgment on Core's breach of contract claim in the nominal sum of one dollar.

IV.

Pursuant to the foregoing, we affirm the judgment of the district court.

AFFIRMED

34