Affirmed in part, reversed in part, and remanded with instructions by published opinion. Judge Duncan wrote the opinion, in which Judge Wilkinson joined. Judge Niemeyer wrote an opinion concurring in part and dissenting in part.
DUNCAN, Circuit Judge:
Two telecommunications carriers, Core-Tel Virginia, LLC and Verizon Virginia, LLC, dispute their respective responsibilities under their interconnection agreement (“ICA”), a contract which governs how the carriers connect their networks and exchange data. Each party contends that the other improperly billed it for various services. The district court granted summary judgment in Verizon’s favor on each claim. For the reasons that follow, we vacate the district court’s decision with respect to Verizon’s facilities claims, but affirm as to the others.
Ironically, in pursuit of its preferred result, the dissent does exactly what it accuses the majority of doing. As we explain in greater detail below, the dissent interprets the ICA as the dissent imagines it should have been written, and not as it was. With no textual support, and in contravention of the cardinal rule that a contract must be interpreted as a whole, giving effect to all its terms, the dissent elevates § 11 to an isolated and independent status, renders superfluous the only provision that specifically deals with interconnection, and altogether ignores § 2.1, which explicitly provides that headings are to have no substantive effect on the agreement’s meaning.
I.
The CoreTel/Verizon ICA[1] at issue here is a private contract that implements duties imposed by the Telecommunications Act of 1996, Pub.L. 104-104, 110 Stat. 56, codified at 47 U.S.C. § 151 et seq. We therefore begin with a brief discussion of *367 the relevant provisions of the Telecommunications Act and the key provisions of the parties’ ICA before turning to the procedural history before us.
A.
The Telecommunications Act seeks to foster competition in the telecommunications market by reducing the competitive advantages enjoyed by the telecommunications carriers, known as “incumbent carriers,” that enjoyed a monopoly in the market at the time the statute was enacted. The Act requires incumbent carriers to share their physical networks with new market entrants, known as “competing carriers,” to mitigate the prohibitive cost of building a new network. This appeal implicates two of the duties imposed on incumbent carriers under 47 U.S.C. § 251.
First, § 251(c)(3) allows a competing carrier to lease components of an incumbent carrier’s physical network for any purpose if an incumbent’s failure to provide these elements would impair the competing carrier’s ability to provide services. 47 U.S.C. §§ 251(c)(3), 251(d)(2)(B). An incumbent carrier must provide these network elements at cost-based rates, known as “TELRIC,” as opposed to higher tariff rates.[2] 47 U.S.C. §§ 251(c)(3), 252(d)(1); 47 C.F.R. § 51.505(b) (2010); see also Implementation of the Local Competition Provisions in the Telecommunications Act of 1996 [“Local Competition Order”], 11 F.C.C. 15499, ¶ 29 (1996). These network elements also must be “unbundled,” meaning that they must be offered individually, and not only as part of a broader package of services. 47 U.S.C. § 251(c)(3); Talk Am., Inc. v. Mich. Bell Tel. Co., — U.S. -, 131 S.Ct. 2254, 2258, 180 L.Ed.2d 96 (2011); Local Competition Order, 11 F.C.C. 15499, ¶ 27.
Second, § 251(c)(2) promotes interconnection, the physical link between two telecommunications networks that allows each carrier’s customers to call the other’s. The FCC has interpreted § 251(c)(2) to require, among other things, that an incumbent carrier lease a competing carrier “entrance facilities” required for interconnection at TELRIC.[3] See Unbundled Access to Network Elements [“Remand Order”], 20 F.C.C. 2533, ¶ 140 (2005); Review of the Section 251 Unbun-dling Obligations of Incumbent Local Exch. Carriers [“Triennial Review Order”], 18 F.C.C. 16978, ¶ 366 (2003); see also Talk Am., 131 S.Ct. at 2261.
Until 2003, the FCC had also interpreted § 251(c)(3) to require incumbent carriers to provide all entrance facilities at TELRIC. However, the FCC reversed course in its Triennial Review Order and Remand Order. It concluded that because “entrance facilities are less costly to build, are more widely available from alternative providers, and have greater revenue po *368 tential,” an incumbent carrier’s failure to provide access to these facilities would not impair the viability of competing carriers. Remand Order, 20 F.C.C. 2533, ¶ 138, 141 (2005).[4] The FCC determined, therefore, that incumbent carriers need not provide entrance facilities on an unbundled basis at TELRIC rates under § 251(c)(3). Id. at ¶ 137.
Significantly, however, the FCC did not alter incumbent carriers’ duties under § 251(c)(2), the provision that specifically governs interconnection. Id. at ¶ 140. Therefore, while an incumbent carrier no longer has a general obligation to provide entrance facilities at TELRIC under § 251(c)(3), it remains obligated to provide entrance facilities at TELRIC when they are used for interconnection under § 251(c)(2). See Talk Am., 131 S.Ct. at 2264-65; Remand Order, 20 F.C.C. 1533, ¶ 140; Triennial Review Order, 18 F.C.C. 16978, ¶¶ 365, 366.
B.
With this regulatory framework in mind, we now turn to the ICA between Verizon, an incumbent carrier, and CoreTel, a competing carrier. A close examination of the ICA is necessary because the § 251 duties discussed above are not directly enforceable. See 47 U.S.C. §§ 251(c)(1), 252(a)(1). Instead, these duties only apply if they are incorporated into an ICA. See Core Commc’ns, Inc. v. SBC Commc’ns Inc., 18 F.C.C. 7568, ¶ 32 (2003), vacated on other grounds by SBC Commc’ns Inc. v. FCC, 407 F.3d 1223 (D.C.Cir.2005).
The interplay between the ICA and the relevant statutory provisions is further complicated by the fact that the Verizon/CoreTel ICA is an adoption of an existing ICA under 47 U.S.C. § 252(i). Because the original ICA took effect before the FCC reinterpreted § 251(c)(3) in its Triennial Review Order and Remand Order, the adoption agreement that accompanies the CoreTel/Verizon ICA contains a provision meant to clarify Verizon’s duties in light of the changed regulatory backdrop. See ICA Adoption Agreement § 1.B, J.A. 366. Section 1.B of the adoption agreement provides that, “adoption of the [ICA] does not include adoption of any provision imposing an unbundling obligation on Verizon that no longer applies to Verizon under [the Triennial Review Order and Remand Order].” J.A. 366.
To aid in our analysis, we will discuss four provisions of the ICA. Section 4 addresses interconnection, § 11 addresses the leasing of network elements, § 5.7 sets out a compensation regime for local cross-network calls, and Exhibit A lists the rates that apply to the agreement. We now address each briefly in turn.
ICA § 4, “Interconnection and Physical Architecture,” addresses the physical interconnection of the parties’ two networks. J.A. 216. This section provides that Core-Tel may specify one of three physical methods to connect with Verizon at an agreed-upon interconnection point. ICA § 4.3.1, J.A. 218. One of the methods allows CoreTel to lease an entrance facility from Verizon.[5] Id. CoreTel may request *369 any of the listed interconnection methods at the “rates and charges, set forth in this Agreement, in any applicable Tariff(s), or as may be subsequently agreed to between the parties.” ICA § 4.3.3, J.A. 218. The ICA provides Verizon analogous rights to interconnect with CoreTel. ICA § 4.3.4, J.A. 218.
ICA § 11, “Unbundled Access,” enumerates the network elements, including entrance facilities, that Verizon will provide to CoreTel on an unbundled basis. J.A. 240-66. This section primarily consists of a detailed list of network elements, expressed in highly technical terms, and the parameters under which they may be ordered.[6] Id.
ICA § 5.7, “Reciprocal Compensation and other Intercarrier Compensation Arrangements,” provides a distinct billing regime for local calls originating within Verizon’s network and terminating within CoreTel’s network (i.e., local calls from Verizon customers to CoreTel customers), and vice versa. J.A. 222. These calls are billed per minute of usage as “reciprocal compensation” by the recipient carrier. See ICA §§ 1.60, 1.60a, 5.7.1, J.A. 212, 222-23; ICA Exhibit A §§ A.I, B.I, J.A. 322, 353.
Finally, ICA Exhibit A lists TELRIC rates for various network elements and includes rates for leasing entrance facilities under the heading “Unbundled Transport.” ICA Exhibit A § A.II.C, J.A. 324. It also includes rates for reciprocal compensation. ICA Exhibit A §§ A.I, B.I, J.A. 322, 353.
c.
Soon after the parties agreed to their ICA, a dispute arose regarding the rates CoreTel is required to pay for interconnection entrance facilities. Verizon insisted that CoreTel pay tariff rates and CoreTel refused. This dispute continued until 2012 when Verizon finally threatened to terminate CoreTel’s service. CoreTel brought suit seeking to enjoin Verizon’s threatened service termination. Verizon filed various counterclaims, and CoreTel amended its complaint to add still more claims. The district court ultimately divided these claims and counterclaims into four broad categories: (1) Verizon’s facilities claims relating to its bills to CoreTel for the entrance facilities CoreTel leased; (2) Cor-eTel’s facilities claims relating to its bills to Verizon for the entrance facilities that CoreTel contends Verizon leased; (3) Verizon’s reciprocal compensation claims; and (4) Verizon’s claims that CoreTel improperly billed it for services under CoreTel’s tariffs.
The district court granted summary judgment in Verizon’s favor on each issue, but on liability only. It reserved the question of damages for trial. The parties then jointly moved for a final judgment reflecting “the stipulated damages that are required by [the district court’s summary judgment] ruling” to expedite an appeal. Joint Motion, J.A. 1500. The district court entered the agreed-to final judgment, and this appeal followed.
II.
Each of the issues discussed below was resolved on motions for summary judg *370 ment. Accordingly, we review each under the same familiar standard:
We review the district court’s order granting summary judgment de novo, viewing the facts in the light most favorable to, and drawing all reasonable inferences in favor of, the nonmoving party. Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.
Garofolo v. Donald B. Heslep Assocs., Inc., 405 F.3d 194, 198-99 (4th Cir.2005) (internal citations omitted).
While we must draw all reasonable inferences in the light most favorable to the nonmoving party, it is ultimately the non-movant’s burden to persuade us that there is indeed a dispute of material fact. Thompson v. Potomac Elec. Power Co., 312 F.3d 645, 649 (4th Cir.2002). It must provide more than a scintilla of evidence— and not merely conclusory allegations or speculation — upon which a jury could properly find in its favor. Id.
Like any other contract, “[w]e interpret [an ICA] as written and, when its terms are clear and unambiguous, we construe the contract according to its plain meaning.” Cent. Tel. Co. of Va. v. Sprint Commc’ns Co. of Va., Inc., 715 F.3d 501, 517 (4th Cir.2013) (internal quotation marks and citation omitted). Because an ICA is a private agreement on the one hand, and an instrument of federal regulation on the other, we are guided in our interpretation by both contract law and relevant federal precedent. Id. at 517 n. 20. When “[t]he contractual duty at issue ... is a duty imposed by the Act itself ... the resolution of a claim regarding the scope of that statutory duty ... depends on the interpretation and application of federal law.” Core Commc’ns, Inc. v. Verizon Md. LLC, 744 F.3d 310 (4th Cir.2014).
III.
On appeal, CoreTel challenges the district court’s grant of summary judgment in Verizon’s favor on all claims. For clarity, we adopt the district court’s categorization of the claims, and address each category in turn.
A.
We first address Verizon’s claims relating to the applicable rates for entrance facilities. Verizon contends that § l.B of the Adoption Agreement eliminated its obligation under the ICA to provide entrance facilities at TELRIC for any purpose. As a result, Verizon has billed Core-Tel for its interconnection entrance facilities at tariff rates since the adoption of the ICA. CoreTel has refused to pay those rates, maintaining that the ICA permits it to pay the lower TELRIC rates.
We agree with the dissent that this is, ultimately, a contract dispute and, as with any contract, we interpret the ICA according to its terms. But the dissent ignores both the “cardinal principle of contract construction ... that a document should be read to give effect to all its provisions,” Mastrobuono v. Shearson Lehman Hutton, Inc., 514 U.S. 52, 63, 115 S.Ct. 1212, 131 L.Ed.2d 76 (1995), and the fundamental rule that, when the written terms of an agreement are clear, evidence of the parties’ intent “is utterly inadmissible.” Moran v. Prather, 90 U.S. 492, 501, 23 Wall. 492, 23 L.Ed. 121 (1874).
As discussed above, ICA § 4.3 is the only provision of the ICA that deals specifically with interconnection. Within that section, § 4.3.1 authorizes CoreTel to order “an Entrance Facility ... leased from Verizon” for interconnection. J.A. 218. ICA § 4.3.3 then provides that CoreTel may order this entrance facility at the *371 “rates and charges, set forth in this Agreement, in any applicable Tariff(s), or as may be subsequently agreed to between the parties.” Id. Exhibit A of the ICA lists, in turn, the schedule of rates for various network elements and services, including TELRIC rates for entrance facilities. ICA Exhibit A § A.II.C, J.A. 324. Though Verizon contends otherwise, the most natural reading of these provisions is that the TELRIC rates listed at Exhibit A § A.II.C. are the “rates and charges, set forth in this Agreement” referred to in ICA § 4.3.3.
Verizon advances an alternative interpretation of the ICA. ICA § 4.3, it contends, does not give rise to any independent obligation to make entrance facilities available at TELRIC but, instead, simply indicates that entrance facilities may be leased under § 11 for interconnection. In Verizon’s view, § l.B of the adoption agreement eliminates its obligation under § 11 to provide entrance facilities at TEL-RIC for any purpose. It contends that entrance facilities are therefore unavailable at those rates under § 4.3.
Simply put, no provision of the ICA indicates that § 4.3 relies upon § 11 in the way Verizon suggests. As explained above, ICA § 4.3 imposes an obligation on Verizon, independent of § 11, to offer entrance facilities at the TELRIC rates listed in Exhibit A.[7] Therefore we need not consider the impact of § l.B of the Adoption Agreement on the services available under § 11. Section l.B of the Adoption Agreement does not affect our analysis of ICA § 4.3 because Verizon’s duties under ICA § 4.3 arise under the specific interconnection provisions of 47 U.S.C. § 251(c)(2). These duties were unaltered by the Triennial Review Order and the Remand Order, the FCC orders incorporated by the Adoption Agreement.
We further note that our conclusion in no way renders the entrance facility provisions of ICA § 11 superfluous. ICA § 11 permitted CoreTel to purchase entrance facilities for purposes not addressed by ICA § 4.3, such as backhauling. See Talk Am., 131 S.Ct. at 2259.
Verizon’s and the dissent’s arguments based on the ICA drafters’ intent are similarly unavailing. Verizon argues, and the dissent accepts, that the drafters of the ICA would never have suspected that 47 U.S.C. § 251(c)(2) imposed a duty, independent of § 251(c)(3), to provide entrance facilities for interconnection at TELRIC because the FCC first explicitly articulated that obligation after the ICA was drafted, in the Triennial Review Order. Thus, Verizon argues, there is no reason to think the drafters intended to write such an obligation into the ICA.
This contention fails for at least two fundamental reasons. First, like any contract, an ICA is interpreted according to its written terms. Cent. Tel. Co. of Va., 715 F.3d at 517. If a contract’s language is clear, we may not choose to supplement it with evidence of the drafters’ intent. See Moran, 90 U.S. at 501. As explained above, we find the language of the ICA sufficiently clear to establish that Verizon must offer entrance facilities at TELRIC for interconnection, without resort to the intent of its drafters.
Second, we find Verizon’s speculation about the drafters’ subjective views *372 unpersuasive. Contrary to Verizon’s and the dissent’s contentions, there are indications that the drafters of the ICA regarded § 251(c)(2) as imposing an independent duty to provide entrance facilities for interconnection at cost-based rates. The most obvious indication is the very existence of § 4.3. This section would have been curiously redundant if § 251(c)(3) and ICA § 11 already required that entrance facilities be provided at cost-based rates for interconnection but § 251(c)(2) did not. Moreover, this obligation flows clearly from the text of the Telecommunications Act itself and longstanding FCC regulations. Section 251(c)(2) requires incumbent carriers to provide interconnection at “any technically feasible point within the carrier’s network,” and the FCC had long interpreted “the carrier’s network” to include its entrance facilities. See Talk Am., 131 S.Ct. at 2261; Local Competition Order, 11 F.C.C. 15499, ¶ 26. Therefore, “[s]ince the enactment of the 1996 Act, the FCC has consistently construed [47 U.S.C. 251(c)(2) ] to mean that an incumbent may be required to provide facilities to a competitor in order to link the two carriers’ networks.” Brief for the United States as Amicus Curiae Supporting Petitioners at 22, Talk Am., Inc. v. Mich. Bell Tel. Co., — U.S.-, 131 S.Ct. 2254, 180 L.Ed.2d 96 (2011) (Nos.10-313, 10-329).
We therefore conclude that the Core-Tel/Verizon ICA entitles CoreTel to order entrance facilities for interconnection at TELRIC.[8] Accordingly, CoreTel was entitled to summary judgment in its favor on both its and Verizon’s claims for declaratory relief relating to Verizon’s facilities charges. We remand to the district court for consideration of CoreTel’s claim for injunctive relief and Verizon’s damages claim in light of this conclusion.
B.
We next turn to CoreTel’s facilities claims. After CoreTel initiated this case, CoreTel submitted 42 new bills — totaling more than $1.7 million — to Verizon for facilities charges beginning in 2009. These charges, CoreTel contends, are for trunk ports and multiplexers[9] used to handle calls delivered by Verizon to CoreTel. CoreTel concedes that Verizon provided its own means of reaching CoreTel’s switch. But it contends that the ports and multiplexers that it provided on its side of the interconnection point qualify as entrance facilities and, accordingly, may be billed to Verizon under ICA §§ 1.25 and 4.3.5.[10]
We agree with Verizon that the multiplexing and trunk ports at issue are not entrance facilities under the ICA. ICA § 4.3.5 therefore provides no basis for CoreTel’s facilities charges.
*373 As it is defined in the ICA, an “entrance facility” is a facility connecting and, crucially, lying “between” the interconnecting carrier’s premises and the other party’s central office. ICA § 1.25, J.A. 208. But the trunk ports and multiplexers CoreTel provided lay within CoreTel’s central office, not “between” CoreTel’s central office and Verizon’s premises. Thus, Verizon’s facilities, not CoreTel’s, spanned the distance between Verizon’s premises and CoreTel’s central office. Accordingly, the facilities CoreTel provided were not entrance facilities under ICA § 1.25.[11]
CoreTel also contends that it was entitled to bill Verizon for its use of these facilities because they were “necessary” to the use of Verizon’s self-provisioned facilities. But CoreTel points to no provision of the ICA that authorizes CoreTel to simply levy facilities charges for any piece of equipment that handles Verizon’s traffic. Instead, the ICA provides that CoreTel is to be compensated for the use of these facilities, on its side of the interconnection point, exclusively under the rubric of reciprocal compensation.
We therefore affirm the district court’s grant of summary judgment on CoreTel’s facilities claims.
C.
We next address Verizon’s reciprocal compensation claims. As discussed above, when a local call is generated on one party’s network and terminates on the other network, the party on whose network the call terminates may bill the originating party for reciprocal compensation. See ICA §§ 1.60, 1.60a, 5.7.1, J.A. 212, 222-23. However, the ICA exempts two categories of traffic from this scheme: “third-party traffic” and “interLATA traffic.”[12] See ICA § 5.7.2(a)-(c), J.A. 223.
Verizon claims that CoreTel violated these provisions by charging it reciprocal compensation for third-party and inter-LATA calls. CoreTel does not contest this allegation. Instead, CoreTel argues that Verizon should have to pay reciprocal compensation charges for a call when it does not provide “EMI data” for it, data Core-Tel claims is needed to properly categorize every call.
However, neither the ICA nor the FCC order on which CoreTel seeks to rely, Cavalier Telephone LLC, 18 F.C.C. 25887 (2003), support this conclusion. Simply put, there is no provision of the ICA that requires Verizon to provide EMI data for every call delivered over the trunk at issue. In addition, Cavalier Telephone is not controlling. Cavalier Telephone was an arbitration order under 47 U.S.C. § 252(e)(5) relating to a separate interconnection agreement between Verizon and Cavalier Telephone. It required only that a provision be inserted into that particular ICA regarding Verizon’s duty to provide EMI data to Cavalier Telephone, not that all carriers provide EMI data independent *374 of the terms of their ICAs. See Id. ¶ 40. Adopting CoreTel’s argument would frustrate the regulatory approach articulated by the FCC in its Core Commc’ns order by allowing carriers to enforce § 251 duties not embodied in their own ICAs. See Core Commc’ns, Inc., 18 F.C.C. 7568, ¶ 32.[13]
We therefore affirm the district court’s grant of summary judgment in Verizon’s favor on CoreTel’s reciprocal compensation claims.
D.
We now address Verizon’s claims that CoreTel improperly billed it for services under its tariffs. Verizon contends that it is entitled to recoup, under the filed-rate doctrine, amounts that it paid to CoreTel for “end-office switched access” because the description of that service in CoreTel’s tariff was inaccurate.[14] The filed-rate doctrine requires that, to charge for services under a tariff, a carrier must provide its services in exactly the way the carrier describes them in that tariff. Bryan v. BellSouth Commc’ns, Inc., 377 F.3d 424, 429 (4th Cir.2004); Brown v. MCI WorldCom Network Servs., Inc., 277 F.3d 1166, 1170 (9th Cir.2002).[15]
CoreTel’s state and federal tariffs provide that CoreTel’s end-office switching service will include “terminations in the end office of end user lines.” FCC Tariff No. 3, § 3.3.2, J.A. 474; Va. SCC Tariff No. 3, § 3.3.1(C), J.A. 555. The FCC has held that this tariff language carries a specific and established meaning: “a physical transmission facility that provides a point-to-point connection between a customer premises and a telephone company office.” AT & T Corp. v. YMax Comm. Corp. [“YMax”], 26 F.C.C.R. 5742, ¶ 40 (2011). To provide “terminations in the end office of end user lines,” a carrier must “provide ... physical transmission facilities that establish point-to-point connections between the premises of Called/Calling Parties and [the carrier’s] equipment.” YMax, 26 F.C.C.R. 5742, ¶ 37, 41.
The undisputed evidence establishes that CoreTel does not provide the physical infrastructure over which calls are delivered from CoreTel’s premises to its customers. Instead, as in YMax, CoreTel converts incoming calls into a data stream once they reach its office and then delivers these calls to its customers over the public internet. See YMax, 26 F.C.C.R. 5742, 1141; J.A. 390(K), (Q)-(R), (T)-(W). This evidence makes clear that CoreTel has not deployed its own physical facilities to connect it to its customers and, accordingly, does not provide “terminations in the end office of end user lines” as required by its tariffs.
It is no mere technicality that the language of CoreTel’s tariff requires that CoreTel itself provide the facilities. End-office switching charges are among the highest recurring charges in any carrier’s tariff, a price that is ordinarily justified by *375 the need “to allow local exchange carriers to recover the substantial investment required to construct the tangible connections between themselves and their customers throughout their service territory.” YMax, 26 F.C.C.R., 5742, ¶ 40. A carrier that finds a way to deliver incoming calls to its customers without building physical connections to each of them has far less infrastructure investment to recoup.
CoreTel argues in the alternative that its tariffs, unlike those in YMax, explicitly permit it to charge for “switched-access service” provided using IP technology. See FCC Tariff No. 3, § 1, J.A. 433. But this language only appears in CoreTel’s general definition of switched-access service. Id. The language interpreted in Ymax, discussed above, appears in Core-Tel’s more specific definition of the particular type of switched access service at issue, end-office switched access. Id. at § 3.3.2, J.A. 474. The specific governs the general. See RadLAX Gateway Hotel, LLC v. Amalgamated Bank, — U.S. -, 132 S.Ct. 2065, 2071, 182 L.Ed.2d 967 (2012). The language of CoreTel’s end-office switching service does not permit that specific tariff rate to be applied when CoreTel delivers calls to customers over the public Internet rather than using a physical facility owed by CoreTel.[16]
We therefore affirm the district court’s grant of summary judgment in Verizon’s favor on Verizon’s switched-access claims.
IV.
For the reasons above, the judgment of the district court is

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED WITH INSTRUCTIONS.

. There are actually two Verizon/CoreTel ICAs. Because they are identical in every term relevant here, we will treat them as a single ICA.

. Carriers generally may only charge rates under tariffs filed with state and federal regulatory agencies but, in certain cases the Telecommunications Act requires a carrier to charge an even lower, TELRIC rate. See Verizon Commc’ns, Inc. v. FCC., 535 U.S. 467, 478, 489, 122 S.Ct. 1646, 152 L.Ed.2d 701 (2002); AT & T Commc’ns of Va., Inc. v. Bell Atl.-Va., Inc., 197 F.3d 663, 674 (4th Cir.1999).

. An "entrance facility" is the physical infrastructure, such as wires or cables, typically used to connect one network with another ("interconnection”) or to transport data to and from equipment that a carrier has installed on another carrier’s premises ("backhaul-ing”). Talk Am., 131 S.Ct. at 2258-59. Backhauling "occurs when a competitive [carrier] uses an entrance facility to transport traffic from a leased portion of an incumbent network to the competitor's own facilities. Backhauling does not involve the exchange of traffic between incumbent and competitive networks.” Id. at 2259 n. 2.

. The FCC initially concluded, in the Triennial Review Order, that entrance facilities are not covered by § 251(c)(3) because they are not “network elements.’’ 18 F.C.C. 16978, V 366. Competitive carriers challenged this interpretation, and the United States Court of Appeals for the District of Columbia Circuit remanded the matter to the FCC, observing that "the Commission’s reasoning appears to have little or no footing in the statutory definition.” U.S. Telecom Ass’n v. FCC, 359 F.3d 554, 586 (D.C.Cir.2004). In response, the FCC promulgated the Remand Order. 20 F.C.C. 2533, ¶ 4.

. The other options allow CoreTel to interconnect through "collocation” — that is, by install *369 ing its equipment inside of Verizon’s facility. ICA § 4.3.1, J.A. 218. One option allows CoreTel to use its own collocated equipment, and the other allows CoreTel to use a third-party’s collocated equipment. Id.

. ICA § 11 does not, for example, contain a listing for "entrance facilities.” Instead, it lists the various, specific types of physical wires and cables that Verizon is to make available, such as "2-Wire HDSL Compatible Loop” or "4-Wire DS 1-compatible Loop.” ICA §§ 11.3.5, 11.3.7, J.A. 243.

. Verizon suggests that, because rates for entrance facilities are listed in Exhibit A only under the heading "Unbundled Transport,” they are available only to entrance facilities ordered under § 11, "Unbundled Access.” J.A. 240, 322. The ICA, however, specifically provides that headings "are not intended to be a part of or to affect the meaning” of the agreement. ICA § 2.1, J.A. 214 — 15.

. We are perplexed by the comfort taken by the dissent in distinguishing entrance facilities as such from interconnection as a “service,” as though the ICA did not specifically link the two by allowing CoreTel to interconnect via entrance facilities.

. A trunk port is a physical port in a switch. See, e.g., Access Charge Reform for Incumbent Local Exch. Carriers Subject to Rate-of-Retum Regulation, 13 F.C.C. 14238, ¶ 49 (1998). A switch is “[t]he critical piece of telephone network equipment that ... connects] a call from any customer’s line to any other customer’s line.” Stuart M. Benjamin et al., Telecommunications law and Policy 952 (3d ed.2012). Multiplexers encode multiple calls so that they may be transmitted on the same wire (and the reverse: extracting a single call from the encoded stream of multiple multiplexed calls). See, e.g., Worldcom, 17 F.C.C. 27039, ¶ 228 (2002).

.CoreTel supports its claim with documents that, it contends, reflect orders from Verizon for these facilities. As we explain below, Cor-eTel was not entitled to bill Verizon for these facilities regardless of whether Verizon submitted orders for them.

. There is no merit to CoreTel’s related contention that Verizon breached the ICA by failing to order an entrance facility. The ICA does not require Verizon to order an entrance facility for interconnection but merely provides that it has the “sole right and discretion” to do so. ICA § 4.3.4, J.A. 208.

. "Third-party traffic” is traffic originated by a third carrier, not a party to the ICA, and merely delivered to the terminating party by way of the other party's network. See ICA § 5.2.1(a)-(b), J.A. 223. Thus, if there were a third carrier, Carrier X that also interconnected with Verizon’s network, Carrier X’s customers might be able to call CoreTel's customers by way of Verizon’s network. Such calls would constitute third-party traffic with respect to Verizon and CoreTel. "InterLATA traffic” is traffic generated outside the local calling area, commonly known as "long distance calls.” See SBC Commc’ns Inc. v. FCC, 138 F.3d 410, 412 n. 1 (D.C.Cir.1998).

. We conclude that CoreTel’s remaining arguments relate only to damages and are foreclosed by the parties’ stipulated judgment. Seel.A. 1518-19.

. Neither party makes clear which switched-access rate category CoreTel applied in levying the contested charges. See FCC Tariff No. 3, § 3.3, J.A. 474; Va. SCC Tariff No. 3, § 3. 3, J.A. 555. The parties appear to agree, however, that "end-office switching” is the relevant category. See Br. at 54, Op. Br. at 52-53.

.The parties provide no authority to establish that Virginia applies the filed-rate doctrine to its state tariffs. CoreTel, however, does not contend otherwise. We therefore conclude that CoreTel has waived this argument and proceed with our analysis assuming, without deciding, that Virginia does indeed follow the filed-rate doctrine.

. Contrary to CoreTel’s contention, a subsequent FCC regulation that incorporates this sort of IP-based termination into a definition of "switched exchange access services” does not alter our interpretation of CoreTel’s tariff. See 47 C.F.R. § 61.26(a)(3)(h) (2012). This regulation merely defines the term for the purposes of determining what tariffs will be subject to regulation as switched-access tariffs. It does not mandate a definition of “switched access” as the term is used in a switched-access tariffs, much less one that vitiates the descriptions of narrower switched-access rate categories.