**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

—————————

**No. 15-1008**

—————————

CORETEL VIRGINIA, LLC,

        Plaintiff – Appellant,

    v.

VERIZON VIRGINIA, LLC; VERIZON SOUTH, INC.; MCIMETRO ACCESS
TRANSMISSION SERVICES, LLC; MCI COMMUNICATIONS SERVICES,
INC.; VERIZON BUSINESS GLOBAL LLC; BELL ATLANTIC
COMMUNICATIONS, INC., d/b/a Verizon Long Distance,

        Defendants – Appellees.

—————————

Appeal from the United States District Court for the Eastern
District of Virginia, at Alexandria. Claude M. Hilton, Senior
District Judge. (1:12-cv-00741-CMH-TCB)

—————————

Argued: September 16, 2015      Decided: November 13, 2015

—————————

Before WILKINSON, NIEMEYER, and DUNCAN, Circuit Judges.

—————————

Affirmed by published opinion. Judge Duncan wrote the opinion,
in which Judge Wilkinson and Judge Niemeyer joined.

—————————

**ARGUED:** Edward Jay Tolchin, OFFIT KURMAN, P.A., Tysons Corner,
Virginia, for Appellant. Scott H. Angstreich, KELLOGG, HUBER,
HANSEN, TODD, EVANS & FIGEL, P.L.L.C., Washington, D.C., for
Appellees. **ON BRIEF:** Eduardo F. Bruera, KELLOGG, HUBER, HANSEN,
TODD, EVANS & FIGEL, P.L.L.C., Washington, D.C., for Appellees.

—————————

DUNCAN, Circuit Judge:

CoreTel Virginia, LLC ("CoreTel"), a telecommunications company, has entered into interconnection agreements with Verizon Virginia, LLC and Verizon South, Inc. (collectively "Verizon") in accordance with the Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56 (codified at 47 U.S.C. § 151 et seq.). In this second appeal arising out of a disagreement between CoreTel and Verizon over their respective obligations under those interconnection agreements, CoreTel disputes the district court's determination that it owes Verizon $227,974.22 for the use of Verizon's telecommunications facilities and $138,724.47 in late-payment fees. For the reasons that follow, we affirm.

I.

The Telecommunications Act of 1996 (the "Act") provides the context for this dispute between CoreTel and Verizon. As we explained more fully in our first opinion, the Act requires incumbent local exchange carriers such as Verizon to allow competitive local exchange carriers such as CoreTel to connect with end users over the incumbent's network. See CoreTel Va., LLC v. Verizon Va., LLC, 752 F.3d 364, 366–68 (4th Cir. 2014) ("CoreTel I"). Using the procedures set out in section 252 of the Act, 47 U.S.C. § 252, carriers negotiate private agreements

2

with each other that establish the rates and terms under which their networks will be interconnected. This case involves two such interconnection agreements: one between CoreTel and Verizon Virginia, and one between CoreTel and Verizon South (the "ICAs").[1]

The ICAs govern, among other aspects of interconnection, CoreTel's use of Verizon's physical telecommunications facilities. In CoreTel I, we addressed the parties' dispute over what rates CoreTel must pay to use Verizon's facilities. See 752 F.3d at 370–72. Verizon took the position that it was entitled to charge the rates set out in its tariffs filed with state and federal regulatory agencies, and billed CoreTel accordingly. CoreTel believed that the ICAs entitled it to purchase access to Verizon facilities at a lower "total element long-run incremental cost," or "TELRIC" rate.[2] CoreTel declined to pay not only the amounts set out in Verizon's tariff-based bills, but also the TELRIC-based amounts CoreTel contended should have been billed.

---

[1] We cite "the ICAs" throughout rather than distinguishing between the Verizon Virginia ICA and the Verizon South ICA. The two agreements are identical in all relevant respects except for pricing, which is dealt in separate "pricing attachments."

[2] TELRIC is a cost-based pricing methodology established by the Federal Communications Commission to encourage competition among carriers. See, e.g., Verizon Commc'ns, Inc. v. Fed. Commc'ns Comm'n, 535 U.S. 467, 495–96 (2002).

Verizon sued for breach of contract, bringing two claims associated with CoreTel's refusal to pay its tariff-based bills. First, Verizon sought a declaratory judgment that, if CoreTel failed to pay, Verizon was entitled to terminate CoreTel's service. Second, Verizon sought damages associated with CoreTel's breach of the ICAs.

In CoreTel I, we held that Verizon should have billed CoreTel for facilities at TELRIC rather than tariff rates, and that therefore "CoreTel was entitled to summary judgment in its favor on . . . Verizon's claim for declaratory relief relating to Verizon's facilities charges." 752 F.3d at 372. We did not, however, resolve Verizon's claim for damages associated with CoreTel's breach of the ICAs. Rather, we remanded that claim so that the district court could apply the proper TELRIC rates to calculate what CoreTel owes Verizon for use of Verizon's facilities. Id.

On remand, the district court held a bench trial, during which Verizon presented the tariff-based monthly bills it had issued to CoreTel and the "pricing attachments" to the ICAs. The monthly bills detail (1) what facilities Verizon provided to CoreTel; (2) whether the facility was provided by Verizon Virginia or Verizon South and, if split between those two, the percentage of the facility in each company's service area; and (3) for transport facilities billed by the mile, the number of

4

transport miles provided.  The ICAs' pricing attachments set out the TELRIC rates associated with each type of facility.  Pricing is the only term on which the Verizon Virginia ICA and the Verizon South ICA differ; the ICAs are otherwise identical in all relevant respects.

From that evidence, Verizon developed a summary spreadsheet containing an entry for every facility it provided to CoreTel with the specific amount owed for each at TELRIC rates. J.A. 865–99.  The entries, in total, reflected debts of $162,871.70 for Verizon Virginia facilities and $65,102.52 for Verizon South facilities, for a total of $227,974.22 in damages.

Verizon also contended that it was entitled to late-payment fees of 1.5% per month on the facilities charges under the ICAs. To calculate the amount, Verizon presented another summary spreadsheet detailing the total unpaid facilities charges accrued (i.e., the principal) for each month and the total late fees associated with those unpaid facilities charges.  J.A. 900–01.  The late fees totaled $131,885.25.

CoreTel raised numerous objections to Verizon's proposed damages calculation, each of which the district court rejected in entering judgment in favor of Verizon for the full amount it

5

sought--$227,974.22 in facilities charges and $138,724.47 in late fees.[3] J.A. 451. This appeal followed.

## II.

Under Virginia law,[4] "[t]he elements of a breach of contract action are (1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation." Ramos v. Wells Fargo Bank, NA, 770 S.E.2d 491, 493 (Va. 2015) (citation omitted). CoreTel has never disputed that the ICAs are valid contracts that require it to pay for its use of Verizon's facilities, that it has in fact used Verizon facilities without paying for that use, or that its failure to pay has injured Verizon.

The sole question in this appeal is whether the district court properly calculated Verizon's damages for CoreTel's breach as we instructed. CoreTel argues (1) that the district court violated our mandate in CoreTel I by awarding as damages any TELRIC-based facilities charges at all; (2) that even if Verizon

---

[3] The $6,839.22 difference between the late fees Verizon calculated at the time of trial ($131,885.25) and the late fees the district court awarded represents additional late-fee accumulation during the two months that passed between the bench trial and the judgment.

[4] The ICAs are governed by Virginia law except to the extent federal law controls. ICAs § 28.5, J.A. 543.

can recover such facilities charges, the district court made several errors in calculating the total amount owed; and (3) that the district court further erred in calculating the late fees CoreTel owes under the ICAs. In addressing CoreTel's arguments, we review the district court's factual findings for clear error and its conclusions of law de novo. See Helton v. AT&T Inc., 709 F.3d 343, 350 (4th Cir. 2013).

## A.

As we clarify during our discussion, several of CoreTel's arguments suffer from the same underlying flaw: a misperception of the mandate rule. The mandate rule "is merely a specific application of the law of the case doctrine." United States v. Pileggi, 703 F.3d 675, 679 (4th Cir. 2013) (citation omitted). It "prohibits lower courts, with limited exceptions, from considering questions that the mandate of a higher court has laid to rest." Moore v. Bennette, 517 F.3d 717, 727 (4th Cir. 2008) (citation omitted).

CoreTel appears to believe that our opinion in CoreTel I froze not only the law of the case but also all the underlying facts. Our remand order in CoreTel I, however, contemplated that the district court would conduct additional fact-finding to determine what CoreTel owes Verizon for facilities at TELRIC rates. The only matter our mandate in CoreTel I "laid to rest" with regard to Verizon's facilities claims is that TELRIC rates

7

should apply, not tariff rates. The district court faithfully followed that ruling.

### B.

We first address CoreTel's argument, under the guise of the mandate rule, that our opinion in CoreTel I precludes Verizon from recovering as damages any facilities charges at all. Essentially, CoreTel interprets that opinion to have mandated complete summary judgment in CoreTel's favor on Verizon's facilities-related claims, leaving Verizon without a live claim on which to seek damages. Thus, CoreTel argues, the district court violated our mandate when it nonetheless awarded damages.

CoreTel misunderstands both CoreTel I and Verizon's claims. As we explain above, Verizon brought two claims related to its provision of facilities to CoreTel: a declaratory-judgment claim and a claim for damages associated with a breach of the ICAs. In CoreTel I, we held that "CoreTel was entitled to summary judgment in its favor on . . . Verizon's claim for declaratory relief relating to Verizon's facilities charges," because we agreed with CoreTel that Verizon was limited to charging the TELRIC rates for its facilities. 752 F.3d at 372 (emphasis added). But we expressly did not resolve Verizon's claim for damages associated with CoreTel's breach of the ICAs. Rather, we "remand[ed] to the district court for consideration of . . .

Verizon's damages claim." Id.[5]  Thus, the district court did not violate our mandate when it considered Verizon's damages claim.[6]

C.

We turn next to CoreTel's challenges to the district court's calculation of the outstanding facilities charges CoreTel owes Verizon.  To understand CoreTel's arguments, some background information about the ICAs is helpful.  Under the ICAs, the parties are to establish "interconnection points" ("IPs") at particular, agreed-upon locations.  See ICA § 4.2.2, J.A. 469.  When a CoreTel customer calls a Verizon customer, CoreTel is responsible for delivering that call to the relevant Verizon IP, either by using its own facilities or by purchasing access to Verizon's facilities at the TELRIC rates set out in

---

[5] CoreTel interprets this quotation to be instructing the district court simply to undertake "the task of adding up the damages Verizon was awarded, outside of its facilities claims." Appellant's Br. at 30 (emphasis added).  But the quotation comes from a portion of CoreTel I that discusses solely Verizon's facilities claims, and the context makes clear that the "damages claim" in question is Verizon's breach-of-contract claim associated with CoreTel's failure to pay for facilities.  See CoreTel I, 752 F.3d at 370–72.

[6] CoreTel further argues that the district court violated our mandate by allowing Verizon to recover TELRIC-based damages after it had contended, prior to CoreTel I, that its facilities should be billed at tariff rates.  This argument is similarly unpersuasive.  Far from a violation of the mandate, calculating and awarding TELRIC-based damages to Verizon was the express purpose for which we remanded this case to the district court after CoreTel I.  See id.

9

the ICAs.  See id. ("Each Party is responsible for delivering its terminating traffic to the other Party's relevant IP.").

Once CoreTel delivers the call to the IP, Verizon is responsible for delivering it the rest of the way to the call recipient.  CoreTel pays Verizon for doing so through a per-minute "reciprocal compensation" charge.  See CoreTel I, 752 F.3d at 369, 373.  In fact, the ICAs define "interconnection point" to mean "the point at which a Party who receives traffic originating on the network of the other Party assesses Reciprocal Compensation charges for the further transport and termination of that traffic."  ICA § 1.37, J.A. 461.

The ICAs label the point at which CoreTel traffic passes from CoreTel-owned facilities onto Verizon-owned facilities as the "point of interconnection" ("POI").[7]  When CoreTel is able to use its own facilities to deliver traffic all the way to the relevant Verizon IP, the POI and the IP are necessarily at the same location.  But when CoreTel uses Verizon facilities to which it has purchased access to deliver traffic to the Verizon IP, the POI and the IP are distinct.

For such situations, the ICAs re-affirm the rule that the mode of compensation does not switch from TELRIC-based

---

[7] Specifically, the ICAs define "POI" to mean "the physical location where the originating Party's facilities physically interconnect with the terminating Party's facilities for the purpose of exchanging traffic."  ICA § 1.54, J.A. 463.

10

facilities charges to reciprocal compensation until the traffic passes the IP. See ICA § 4.2.3, J.A. 469 ("To the extent the originating Party's [POI] is not located at the terminating Party's relevant IP, the originating Party is responsible for transporting its traffic from its POI to the terminating Party's relevant IP."). In other words, CoreTel must pay TELRIC-based facilities charges for any Verizon facilities it uses to transport traffic between the POI and the relevant Verizon IP.

With that background in mind, we now turn to CoreTel's specific objections to the district court's damages calculation. CoreTel contends that the district court erred by (1) including in its damages calculation any facilities charges associated with Verizon South at all; (2) using the National Exchange Carrier Association's FCC Tariff No. 4 ("NECA Tariff No. 4") to allocate charges for facilities jointly provided by Verizon Virginia and Verizon South; (3) using Verizon South's TELRIC rate to calculate damages for a multiplexer previously billed at Verizon Virginia's (lower) TELRIC rate; (4) including in its damages calculation charges for transport between Verizon's "serving wire centers" and its IPs; (5) imposing 100% of the TELRIC rate for certain facilities for which Verizon had previously billed CoreTel only a percentage of its tariff rates; and (6) failing to apply the two-year statute of limitations set out in 47 U.S.C. § 415(a). We address CoreTel's arguments in

turn below, ultimately rejecting each and affirming the district court's calculation of the TELRIC-based facilities charges CoreTel owes Verizon.

1.

CoreTel first argues that it should not owe any facilities charges at all to Verizon South because CoreTel traffic always entered the Verizon network via Verizon Virginia facilities, even when the traffic terminated with Verizon South. According to CoreTel, it should have to pay only Verizon Virginia, through whose facilities CoreTel's traffic enters the Verizon network. If CoreTel's traffic thereafter uses Verizon South facilities, CoreTel contends that Verizon Virginia, not CoreTel, should have to compensate Verizon South for that use.

The ICAs, however, make clear that CoreTel must pay Verizon Virginia for use of Verizon Virginia facilities and Verizon South for use of Verizon South facilities, regardless of where CoreTel traffic enters the Verizon network. Under section 4.2.2 of the ICAs, "[e]ach Party is responsible for delivering its terminating traffic to the other Party's relevant IP." J.A. 469. Moreover, the Verizon Virginia ICA expressly covers "services in Verizon Virginia's service territory . . . only," J.A. 612, and the Verizon South ICA expressly covers "only services in Verizon South's service territory," J.A. 619. Thus,

12

the district court properly included Verizon South facilities charges where CoreTel used Verizon South facilities.

2.

CoreTel also contends that the district court erred by using NECA Tariff No. 4 to determine how to calculate charges for facilities located partially in Verizon Virginia territory and partially in Verizon South territory. NECA Tariff No. 4 is an industry standard methodology used to establish, for telecommunications facilities located in multiple companies' territories, what percentage of a particular facility should be billed by each company. It does not establish actual tariff rates to be charged by those companies.

CoreTel does not contest that, as a general matter, NECA Tariff No. 4 provides a proper methodology for apportioning charges for jointly provided facilities. Instead, it argues that the district court's reliance on NECA Tariff No. 4 was improper because "this Court has ruled that the ICA's rates, terms and conditions--not any Verizon tariff--apply to the facilities Verizon provided." Appellant's Br. at 44. NECA Tariff No. 4, however, is not a Verizon tariff; it is a tariff filed by the National Exchange Carrier Association. Thus, the district court's use of NECA Tariff No. 4 did not contravene our ruling in CoreTel I that Verizon's tariffs do not apply here.

13

Moreover, the ICAs provide no guidance as to how billing should be apportioned for facilities jointly provided by Verizon Virginia and Verizon South. When the parties to a contract "have not agreed with respect to a term which is essential to a determination of their rights and duties," the court supplies "a term which is reasonable in the circumstances." Restatement (Second) of Contracts § 204 (1981). Here, the district court's decision to rely on an industry standard methodology was eminently reasonable.[8]

3.

We next address CoreTel's contention that the district court erred by using Verizon South's TELRIC rate (rather than Verizon Virginia's) to calculate what CoreTel owes Verizon for CoreTel's use of a multiplexer located in Great Bridge, Virginia. Great Bridge is in Verizon South's territory. But between January 2008 and March 2009, Verizon's monthly bills

---

[8] CoreTel's other complaints concerning NECA Tariff No. 4 are equally unavailing. CoreTel asserts that NECA Tariff No. 4 is "inconsistent with the TELRIC methodology," Appellant's Br. at 44, but offers neither an explanation of this purported inconsistency nor any alternative method for apportioning facilities charges for jointly provided facilities. CoreTel also incorrectly claims that Verizon did not introduce NECA Tariff No. 4 at trial. Although it is true that Verizon did not introduce the entire nationwide tariff (most of which would have been irrelevant), Verizon did introduce into evidence the specific billing percentages from NECA Tariff No. 4 it relied on. Those percentages appeared on Verizon's monthly bills to CoreTel, and CoreTel did not contest their accuracy at trial.

14

identified that multiplexer as being provided by Verizon Virginia. At trial, Verizon introduced evidence that this was a mistake and that the multiplexer should always have been associated with Verizon South. Accordingly, in its damages request, Verizon billed the Great Bridge multiplexer at the Verizon South TELRIC rate (which is substantially higher than the Verizon Virginia rate), except for the months for which its bills had affirmatively associated the multiplexer with Verizon Virginia. For those months, Verizon gave CoreTel the benefit of the purported billing error and charged the lower Verizon Virginia rate.

As CoreTel's president conceded at trial, there is no dispute that the Great Bridge multiplexer is located in Verizon South territory. See J.A. 405–06. Nevertheless, CoreTel contends that Verizon did not catch this mistake in previous estimates of the damages CoreTel owes it, and should not be permitted to "change the facts at its whim, after remand." Appellant's Br. at 46.

CoreTel's argument is without merit. Verizon was entitled to present its evidence at trial that the Great Bridge multiplexer should always have been billed at Verizon South's rate, just as CoreTel was entitled to counter with Verizon's monthly bills and prior damages calculations that showed the Great Bridge multiplexer being associated with Verizon Virginia

15

at times.  The district court considered both parties' evidence, and it did not clearly err in finding that Verizon's was more persuasive, particularly given CoreTel's president's concession that the Great Bridge multiplexer is in Verizon South territory.

4.

We turn next to CoreTel's argument that the district court erred by including in its damages calculation charges for transport between Verizon's "serving wire centers" and the relevant Verizon IP.  This is essentially a dispute about the definition of the term "entrance facility."  The ICAs define "entrance facility" to mean "the facility between a Party's designated premises and the Central Office serving that designated premises."  ICA § 1.25, J.A. 460.  CoreTel contends that when it purchases use of an entrance facility, transport to the relevant Verizon IP is included in that purchase.  Verizon, on the other hand, contends that an entrance facility ends at the Verizon switch nearest to CoreTel's premises--Verizon calls this the "serving wire center"--and that CoreTel therefore must purchase additional transport to get its traffic to the relevant Verizon IP.

Verizon's interpretation adheres more closely to the language of the ICAs.  The ICAs' definition establishes that an entrance facility begins at "[CoreTel]'s designated premises" and ends at Verizon's "Central Office serving that designated

16

premises." Id. The ICAs define "Central Office" as "a local switching system for connecting lines to lines, lines to trunks, or trunks to trunks for the purpose of originating/terminating calls over the public switched telephone network." ICA § 1.11, J.A. 458. Thus, the entrance facility ends at the Verizon switch nearest the point of interconnection, and CoreTel must pay for any additional transport needed to reach the relevant Verizon IP, which, as we have explained, may be located at a different point. The district court did not err by including charges for such transport in its damages calculation.

5.

We next address CoreTel's argument that the district court erred by imposing 100% of the TELRIC rate for certain facilities for which Verizon had previously billed CoreTel only a percentage of its tariff rates. CoreTel contends that Verizon's bills show it only partially used the facilities in question and should therefore be billed only a partial TELRIC rate. The district court, however, found that the facilities in question had been completely dedicated to CoreTel's use, and as we explain below, that finding was not clearly erroneous.

Under Verizon's tariffs, different rates applied to certain facilities, depending on what type of access the customer

17

required--switched access or special access.[9] When CoreTel customers used a single Verizon facility for both special and switched access, Verizon charged the two rates proportionally on its tariff-based monthly bills. See, e.g., J.A. 694 (billing 57.14% of the tariff rate for switched access and 42.86% of the tariff rate for special access). The TELRIC rates, however, do not differentiate between special and switched access. Thus, when Verizon re-calculated its bills applying TELRIC rates, it simply charged 100% of the TELRIC rate for facilities that had previously been split between special and switched access.

In several instances, Verizon's tariff-based bills stated a proportional charge for one type of access, but omitted a counterpart for the other type. See, e.g., J.A. 694 (billing 57.14% of the tariff rate for switched access without a corresponding line-item for special access). At trial, Verizon presented evidence that these omissions were billing errors and that CoreTel had in all cases used the entire facility. CoreTel disputed that evidence, arguing that the omissions actually

_____

[9] "Special access" occurs when the facility in question is used for a dedicated, exclusive connection between two particular users. Under "switched access," in contrast, a facility is not dedicated to a particular end user. See, e.g., WorldCom, Inc. v. Fed. Commc'ns Comm'n, 238 F.3d 449, 453 (D.C. Cir. 2001). A detailed understanding of the difference is not necessary here--the salient points are that Verizon's tariffs establish a different rate for each type of access, and that Verizon charged a blended rate when a single facility was used for both types.

18

showed that CoreTel had used only part of the relevant facilities and should therefore be charged only part of the TELRIC rate for those facilities.

The district court found that "[t]he invoices do not support CoreTel's argument," and that the relevant facilities "were entirely dedicated to CoreTel's use," and therefore included 100% of the TELRIC rate for the relevant facilities in its damages calculation. J.A. 448. We will overturn a district court's factual finding as clearly erroneous only if we are "left with a definite and firm conviction that a mistake has been committed." Evergreen Int'l, S.A. v. Norfolk Dredging Co., 531 F.3d 302, 308 (4th Cir. 2008) (citation omitted). And "[i]n cases in which a district court's factual findings turn on assessments of witness credibility or the weighing of conflicting evidence during a bench trial, such findings are entitled to even greater deference." Helton, 709 F.3d at 350.

Here, the district court's finding that CoreTel used 100% of the facilities in question was based on its weighing of conflicting evidence--Verizon's original bills charging CoreTel for only part of certain facilities against Verizon's evidence that those original bills were mistaken. CoreTel contends that the district court should have weighed that evidence differently, but falls far short of showing that the district court clearly erred. Accordingly, we affirm the district

19

court's determination that CoreTel owes Verizon 100% of the TELRIC rate for the facilities CoreTel used.

6.

Finally, we address CoreTel's contention that the district court should have applied the two-year statute of limitations set out in 47 U.S.C. § 415(a), which requires that "[a]ll actions at law by carriers for recovery of their lawful charges . . . be begun within two years from the time the cause of action accrues." Were that statute of limitations to apply, Verizon would be barred from seeking facilities charges incurred before July 2010. We hold that CoreTel waived reliance on 47 U.S.C. § 415(a) by failing to raise this defense below.

Before the district court, CoreTel never mentioned the statute of limitations in 47 U.S.C. § 415(a). Instead, it sought to apply the statute of limitations set forth in subsection (b) of the same statute, which applies to "complaints against carriers for the recovery of damages not based on overcharges." 47 U.S.C. § 415(b). The parties' briefing before the district court focused on whether the section 415(b) statute of limitations could apply to an action between two telecommunications carriers concerning a breach of an interconnection agreement, as opposed to a complaint against a telecommunications carrier by a customer of that carrier. The district court declined to apply section 415(b), and CoreTel

20

does not take issue with that decision on appeal. Rather, it attempts to show that it sufficiently raised a statute-of-limitations defense based on section 415(a) to preserve the issue for appeal.

When a party fails to raise a statute-of-limitations defense before the district court, it waives the right to do so on appeal. See, e.g., Verizon Md., Inc. v. Global NAPS, Inc., 377 F.3d 355, 369 (4th Cir. 2004). It is not enough for a party to raise "a non-specific objection or claim." In re Under Seal, 749 F.3d 276, 287 (4th Cir. 2014). "[I]f a party wishes to preserve an argument for appeal, the party must press and not merely intimate the argument during the proceedings before the district court." Id. (citation omitted). In other words, the party must raise the argument in a manner sufficient "to alert the district court to the specific reason" the party seeks relief. United States v. Bennett, 698 F.3d 194, 199 (4th Cir. 2012).

In support of its contention that it sought to apply section 415(a) before the district court, CoreTel points only to (1) its statement in its answer that Verizon's counterclaims are "barred by the statute of limitations," J.A. 94; (2) a reference in its post-bench-trial proposed findings of fact to section 415 in general (without specifying a subsection); and (3) its citation of a case to the district court that applied

21

section 415(b), but whose reasoning (CoreTel asserts) is equally applicable to section 415(a). See Reply Br. at 29. In none of these instances did CoreTel invoke section 415(a) with anything close to the specificity that would have been required to alert the district court that it needed to analyze whether that statute might bar certain damages Verizon sought. Accordingly, CoreTel has waived any right it may have had to assert section 415(a)'s statute of limitations on appeal.

## D.

Having affirmed the district court's calculation of the TELRIC-based facilities charges CoreTel owes Verizon, we turn to CoreTel's challenge of the district court's award of $138,724.47 in late fees to Verizon. CoreTel argues (1) that it cannot owe late fees under the ICAs because Verizon has never issued it formal bills at the proper TELRIC rates, (2) that Virginia law limits any late fees to 5% per year rather than the ICA-prescribed 18% per year that the district court imposed, and (3) that the principal on which any late fees are calculated should be offset by certain payments Verizon has withheld from CoreTel during the course of this litigation. As we explain below, we do not find CoreTel's arguments persuasive.

## 1.

CoreTel argues that Verizon's failure to issue formal TELRIC-based bills precludes Verizon from charging late fees.

22

As a general matter, the ICAs' billing provisions plainly authorize late fees. Section 28.8.1 of the ICAs requires each party to submit "on a monthly basis an itemized statement of charges incurred by the other Party during the preceding month(s) for services, facilities or arrangements provided hereunder." J.A. 546. Section 28.8.7 of the ICAs subjects CoreTel to a late-payment charge on any "[c]harges which are not paid by the due date stated on Verizon's bill." J.A. 547.

Verizon issued monthly bills to CoreTel, but its bills were based on tariff rates. We have held that those rates were improper. See CoreTel I, 752 F.3d at 372. But when the party receiving a bill disputes the amount purportedly due, the ICAs do not permit that party to refuse to pay anything at all for the billed services. Rather, under Section 28.8.3, the party remains obligated to "pay when due . . . all undisputed amounts." J.A. 546. CoreTel has never argued that it should receive facilities from Verizon for free; its position has always been that it should pay under TELRIC rates. But CoreTel elected not to pay even that undisputed amount--an amount it could have estimated based on the information in Verizon's

tariff-based bills.  CoreTel therefore incurred late fees under the ICAs.[10]

2.

CoreTel further argues that Virginia law requires any late-fee award to be limited to 5% per year.  CoreTel relies on Va. Code Ann. § 6.2-400, which provides that "[a]ny lender or seller may impose a late charge for failure to make timely payment of any installment due on a debt, whether installment or single maturity, provided that such late charge does not exceed five percent of the amount of such installment payment."  Here, Verizon sought and the district court awarded late fees at 18% per year (1.5% per month) based on the ICAs' provision in Section 28.8.7 that late fees "shall be an amount specified by Verizon which shall not exceed a rate of one and one half percent . . . of the overdue amount (including any unpaid previously billed late payment charges) per month."  J.A. 547.

Once an ICA has been approved by a state utilities commission, its provisions are not subject to attack on state-

_____

[10] CoreTel also contends that Verizon waived any right to collect late fees because each of the monthly bills in the record contain a line item specifying $0.00 in "Late Payment Charges Applied."  See J.A. 639, 714, 753.  The ICAs' anti-waiver provision bars this argument.  See ICA § 28.18, J.A. 551 ("A failure or delay of either Party to enforce any of the provisions hereof, to exercise any option which is herein provided, or to require performance of any of the provisions hereof shall in no way be construed to be a waiver of such provisions or options.").

law grounds. In Core Commc'ns, Inc. v. Verizon Md. LLC, we explained that, by requiring state-commission approval of ICAs, the Act "creates a narrowly defined time and forum for identifying and evaluating any state-level policy that might invalidate part or all of an ICA," rendering ICAs immune from "any subsequent attack on the basis of a state law principle." 744 F.3d 310, 323 (4th Cir. 2014). Virginia's state utilities commission approved both of the ICAs at issue here, including their late-fee provisions. Thus, CoreTel may not now claim that those provisions violate Virginia law.[11]

3.

Finally, CoreTel argues that the district court should have reduced the principal amount on which CoreTel's late fees were calculated to account for certain payments Verizon has withheld from CoreTel during the course of this litigation. The withholdings in question arise from the terms of the stay of judgment the district court entered pending our decision in CoreTel I. Under that judgment, Verizon would have been entitled to a net payment from CoreTel of $890,000. J.A. 101–02, 105. Rather than posting a bond as a condition for the stay pending appeal, CoreTel agreed that Verizon would be able to

---

[11] This principle also dooms CoreTel's argument that the district court's late-charges award constitutes impermissible liquidated damages under Virginia law.

25

withhold future reciprocal-compensation payments from CoreTel "to satisfy in part the stipulated judgment." J.A. 104. After, in CoreTel I, we reversed and remanded the portion of the district court's judgment dealing with Verizon's facilities claims, the parties did not re-negotiate the terms of the stay, and Verizon continued to withhold reciprocal-compensation payments. At the time of the bench trial, Verizon had withheld approximately $92,000. See J.A. 264.

CoreTel contends that every time Verizon withheld a reciprocal-compensation payment that would otherwise have been due to CoreTel, CoreTel's outstanding balance for facilities charges should have been reduced by an equal amount. But the terms of the stay provide no support for CoreTel's position. The stay requires only that Verizon apply the withheld payments "to satisfy in part the stipulated judgment," and do not specify any particular portion of the judgment to which the payments must be applied. Thus, Verizon was free to apply its withheld payments however it saw fit. For example, Verizon could have paid down the late fees themselves instead of the principal on which the late fees are calculated. The evidence before the district court did not establish exactly how Verizon applied the withheld payments, but it did make clear that Verizon had applied them in a way that did not reduce CoreTel's outstanding facilities charges. Thus, the district court properly based its

26

late-fee calculation on the entire amount of those outstanding facilities charges.

## III.

For the foregoing reasons, the judgment of the district court is

<u>AFFIRMED</u>.

27